## LONG v. SILVER LINE, Limited.
### No. 259.

Circuit Court of Appeals, Second Circuit.
April 6, 1931.

MANTON, Circuit Judge, dissenting.

Charles J. O'Connor, of Brooklyn, N. Y. (Richard F. Lenahan and James M. Gorman, both of New York City, of counsel), for appellant.

Lord, Day & Lord, of New York City (Thaddeus G. Cowell and Thomas Daly, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

Long was employed by Morse Dry Dock & Repair Company in the capacity of "passer boy" to a riveting gang working on appellee's ship. His injuries resulted from a fall into an open tank while he was on the between-decks on March 1, 1928. His libel charged the vessel owner with negligence in having left open the tank and in having failed to light the between-decks. Other charges of negligence also were alleged, but as such matters had nothing to do with Long's fall they may be ignored.

At the time of the accident, the vessel was lying at the Morse Company's dock, but she was not out of commission and her officers and crew were on board. The repairs in question were to be made to the four deep tanks in hatch No. 3. They were of the usual construction. Each tank has an opening onto the between-decks which can be closed by an iron cover that rests upon an eleven-inch combing surrounding the opening. The four openings are arranged in pairs near the center of hatch No. 3, and the combing surrounding them results in forming a fore and aft passageway along the floor of the between-decks between the openings to the port tanks and those to the starboard tanks, and a similar passageway athwartships between the fore and after tank tops. The width of the fore and aft passageway was four feet and that of the passageway leading athwartships forty inches. Forward and aft of the tanks and also on their outboards sides there was considerable space on the between-decks. In preparation for the repairs, the ship's crew had removed the cover of each tank, placed it sidewise upon the combing, and lashed it down. This left each tank top uncovered for a space of about four feet fore and aft adjacent to the athwartships passageway. The covers had been in this position for a number of days in order to give access to the tanks and to ventilate them (as was necessary) before work was done in them. A representa-

tive of the Morse Company had seen the covers so arranged when he·inspected the tanks to determine what repairs were required before making the contract to perform them.

There were no lighting fixtures in the between-decks. Two days before the accident, the Morse Company installed a portable lighting system for use in the tanks and between-decks. The electric current was conducted by a feed wire from the dock to a switch box on deck into which could be plugged wires carrying portable lights. On the day of the accident, when the day shift of workmen left at 4:30 p. m., three such lights were in use. Each was a 200-watt bulb suspended below a reflector which cast the light downward. Two of them were hanging in the two port tanks and the third was suspended to the strong back of the hatch to give light in the between-decks. But when the night shift, ·of which Long was a member, came on board at 4:50 p. m., this third light was hanging ·in No. 3 tank; hence the between-decks was in darkness except for such natural light as came through the partly opened hatch. Corris, libelant's foreman, says that when he entered the between-decks "we were just about ·able to see." But when the accident happened at 6:40 p. m.,·the natural light in the between-decks was negligible. A forge had been set up in the passageway athwartships, but this gave no light except in its immediate vicinity.

When Long came on board he proceeded from the main deck down to the between-decks and thence into tank No. 2. He saw Corris go into tank No. 1. Thereafter Long made several trips back to the dock, and on one of these occasions, in company with Corris, hunted up the Morse Company's electrician to ask for a light to hang in the between-decks. The electrician promised to come in a short time. Long then went back into tank No. 2 and was told by a fellow workman to go on deck and get a block of wood for use in the work. He proceeded to the between-decks, found a block of wood, and while returning with it fell into tank No. 4, the after tank on the starboard side. He has no recollection of how he came to fall. The only eyewitnesses say he was walking over the tankstops and stepped into the opening.

■ The fault of the ship, if any, was in failing to supply a light in the between-decks. There was no negligence in leaving No. 4 tank open, for this was necessary for entrance to the tank and for ventilation in preparation for the work. The ship had no control over ·the order of the work, and for all appellee

knew tank No. 4 would be the first tank worked upon. It is well settled that there is no negligence in leaving open a cargo hatch if the ship is awaiting·cargo. Smith v. United States (D. C.) 18 F.(2d) 110, affirmed 18 F.(2d) 111 (C. C. A. 2); The Saratoga, 94 F. 221 (C. C. A. 2); The Kongosan Maru, 292 F. 801 (C. C. A. 9); The Louisiana, 74 F. 748 (C. C. A. 5). The situation here is analogous, where the ship was awaiting repairs to all four tanks and the order in which they were to be made was controlled by the repairman.

■ With respect to lighting the between-decks, it should be noted that light was available if the light in No. 3 tank had been utilized. No work was being done in that tank on the date in question, and that light could have been restored to the place where it was at 4:30 when the day shift left. How it came to be moved from there and why it was not replaced when Corris desired more light in the between-decks does not in any way appear. The situation is identical with that disclosed in The Hindustan (D. C.) 37 F.(2d) 932, affirmed by us in 44 F.(2d) 1015, except that there the ship supplied the lights which the contractor's workmen failed to use, while here the contractor supplied them. That is not a valid ground·for distinction, unless we are prepared to say that the shipowner must stand by and see to it that the contractor's workmen use the means·supplied by the contractor for their safety, though it need not do so when the means are ·supplied by the ship. ·A majority of the court does not think the law imposes so extreme a duty. Although the Morse Company's contract said nothing as to who was to supply the lighting, it had voluntarily undertaken to do so. No one asked, or expected, the ship to furnish the lights. See The Omsk, 266 F. 200, 201 (C. C. A. 4). Under the circumstances the utmost duty that the appellee could have owed Long was to warn him that it would be dangerous to walk about the between-decks in the dark. That knowledge Long already had. He had asked the Morse Company's electrician for more light. He knew that two of the tank tops were open, and had no reason to assume the others were not in the same state. He could safely have gone to the main deck or the dock for the block of wood. There is no duty to keep a dark way safe if a light way is provided. Hardie v. N. Y. Harbor Dry Dock Corp., 9 F.(2d) 545 (C. C. A. 2). Although work had not yet begun upon·tank·No. 4, we think the District Court correctly found that all ·four tanks·and the between-decks of hatch

No. 3 were under the control of the Morse Company, and correctly held that the appellee was free from negligence. The case is governed by the principles announced in such decisions as The Louisiana, supra; The Saratoga, supra; The Jersey City, 46 F. 134 (D. C. S. D. N. Y.); The Clan Graham, 163 F. 961 (D. C. Or.); The Auchenarden, 100 F. 895 (D. C. E. D. N. Y.), and Willis v. Lykes Bros. S. S. Co., 23 F.(2d) 488 (C. C. A. 5), rather than by the cases relied upon by the appellant, all of which we regard as clearly distinguishable.

Decree affirmed.

MANTON, Circuit Judge, dissents.