[Civ. No. 15094. First Dist., Div. Two. Dec. 31, 1953.]

RUSSELL HAGY et al., Respondents, v. ALLIED CHEM-
ICAL & DYE CORPORATION (a Corporation) et al.,
Appellants.

362

Weinmann, Rode, Burnhill & Moffitt and Cyril Viadro for Appellants.

Bernheim & Sugarman for Respondents.

GOODELL, J.—This appeal was taken from a judgment in favor of Katherine Hagy for $25,000, and her husband Russell Hagy for $5,000, after a new trial was denied.

Appellant Allied Chemical & Dye Corporation owns and operates a plant in Richmond, California, wherein it manufactures sulphuric acid. Appellants Compton and Hicken were joined as its employees.

Respondents sued for personal injuries claimed to have been sustained by both of them because of the negligent operation of Allied's plant on December 21, 1949. Respondents' theory is that Mrs. Hagy then had a cancer of the larynx, and her husband had a serious heart condition, and because of such negligent operation of the plant a penetrating and irritating "smog"* resulted which seriously aggravated the preexisting condition of each of them.

The plant is situated on Castro Street in the industrial area of Richmond. Neighboring plants are those of California Spray Chemical Corporation, Standard Chemical Corporation, American Radiator and Sanitary Corporation, and Standard Oil Company. The plant is also in the vicinity of the Santa Fe's railroad yards and the Southern Pacific's industrial tracks.

The following is lifted bodily from appellants' statement of the case:

"Allied produces sulphuric acid from raw sulphur or from hydrogen sulphide gas piped into the Allied plant from the neighboring plant of Standard Oil Company. The process calls for the burning of the sulphur or the hydrogen sulphide into sulphur dioxide. The sulphur dioxide ($SO_2$) is then converted into sulphur trioxide ($SO_3$) and eventually into sulphuric acid. Sulphur dioxide is a gas and so is sulphur trioxide. Sulphuric acid is of course a liquid. In the course of production, some waste gases are eliminated into the atmosphere through three stacks approximately one hundred feet high.

"On December 21, 1949, the plant had been shut down most of the day for maintenance work. Operations started again at 6:25 p. m. By 8:25 p. m., it had to be shut down again because of an atmospheric condition known as an inversion. Briefly described, an inversion is a condition in which,

---

*"Smog" is a word in such general use these days that it is difficult to give it a specific and exact meaning. Webster's New International Dictionary, Unabridged, 2d ed., under "smog" says: "[A blend of *smoke* and *fog*]. A fog made heavier and darker by the smoke of a city. U.S." In the briefs the word is used freely by both sides, and when we use it herein (for brevity and for lack of a better term) it must, of course, be taken to mean the particular kind or variety of smog shown by this record to have been in the air at Richmond on the evening in question, produced by the operation of Allied's sulphuric acid plant between 6:25 and 8:25 p. m., and composed of fumes emitted by the plant under atmospheric conditions which kept them from rising and being entirely carried off and blown away, but caused them, instead, to hang low, close to the ground.

instead of being warm near the ground and cold at a higher altitude, the air is cold near the ground and warm at a higher altitude. Since the cold air cannot and does not rise, as warm air would, the impurities which find themselves in the atmosphere are not carried away and a so-called smog results. Moreover, when there is a descending motion in the atmosphere, as there was on the evening of December 21, 1949, the impurities are actually brought down to ground level . . .

"At approximately 8 p. m., Mr. and Mrs. Hagy, who were on their way home after visiting a friend, drove past the Allied plant and through the smog. It made them cough, their eyes started smarting and Mrs. Hagy even fainted. Later in the evening, they went to Herrick Memorial Hospital in Berkeley where they were given oxygen inhalations and then sent home. Both went to work as usual the next day."

Appellants do not contend that there is insufficient evidence of negligence in the operation of their plant on that evening. At the opening of the discussion they say: "For the purpose of argument, we may assume that Allied should have discovered the inversion and stopped operating sooner than it did and that accordingly it did not act as a reasonably prudent producer of sulphuric acid would have acted under the circumstances."

This brings us to the situation prevailing between 6:25 and 8:25 p. m. on December 21st, about which there is no substantial conflict.

When the plant was started up at 6:25 p. m. there were three employees on duty, namely, defendant Hicken, who was the plant chemist and two operators, Wilson and Whitman.

The trouble started about 7 p. m. The fumes passing up through the stacks were heavy, like a moist fog, and were drifting toward town. Wilson testified that the moisture discharged through the stacks was "sulphuric acid in the gas or liquid form, or vapor form" and that it caused him to cough and sneeze, and caused his eyes to burn, smart and run. It got worse—thicker. At one time, he testified, he could not see the full length of the hall within the plant. Between 7:15 and 7:30 he suggested to Hicken that the plant be closed down but Hicken replied "We'll get straightened around in a little while." When Wilson told Hicken that it was getting pretty bad, and expressed the opinion that they should shut down, Hicken replied that he "had to get the heats up in the converters" to which Wilson responded that if

they didn't shut down "he would probably get heat, but it wouldn't be in the converters." The way the stacks were acting was characterized as an "inversion," already defined, where the fumes normally emitted from the stacks come downward because of atmospheric conditions, instead of going upward.

About 7 p. m. telephone complaints began to come into the plant. Railroad men working in the yards close by wanted to know what was wrong and complained that the smog was bothering their eyes and lungs. After several such calls Hicken told Wilson not to answer the telephone; Wilson obeyed but it continued to ring.

About 7:45 the fumes within the plant were so dense that Hicken and Whitman had to put on their gas masks (which generate their own supply of oxygen). Wilson had no mask and had to go outside to the back of the plant and then to the front repeatedly so as to breathe. The longer the plant operated, the heavier became the smog, and at 8:25 p. m. the plant was shut down as an emergency measure.

A Standard Oil employee working at the Standard plant close by Allied, noticed what appeared to be a fog bank coming in, low, near the ground, which burned his nose and throat, so that he put on a gas mask. Others did likewise.

A Southern Pacific employee working about three-quarters of a mile away was affected by the fumes which he said came from Allied, and which he characterized as "acid fumes."

Between 8 and 9 p. m. a housewife living several blocks from the plant noticed that her throat burned and her eyes smarted; her husband and daughter had the same sensations. She opened the door, saw the smog, and at once closed it, since her throat and eyes burned. All three persons stayed in the back part of the house until the smog was gone, but all of them continued to cough for three or four days or a week.

A police officer testified that a man residing on Commercial Street, a number of blocks from the Allied plant, reported "a thick fog, accompanied by a strong irritating odor, that smelled like sulphur fumes. This odor caused some of the occupants to become sick at their stomachs." Several other witnesses testified in a similar vein.

It has been said above that there was no substantial conflict in the evidence respecting the smog conditions in and around the Allied plant at the time in question. In fairness it should be said that appellants claim there was no satisfactory evidence respecting the liquid or moist character of the

smog, and they criticize Wilson's testimony in this respect. However viewed, it cannot be gainsaid that a very serious smog situation existed (moisture or no moisture) and appellants frankly admit that it was close to the ground when they say: "When there is a descending motion in the atmosphere, as there was on the evening of December 21, 1949 *the impurities are actually brought down to ground level.*" (Emphasis added.) It was at *ground level* that the respondents ran into the smog as they drove along Castro Street immediately in front of the plant. This was at the time when the smog was so dense within the plant that two of its employees had to put on gas masks in order to stay at their posts and when, according to Wilson, the "pocket" was at ground level *outside* the plant.

Russell Hagy was driving home with his wife after they had called on a friend near San Pablo Yacht Harbor, and their route took them along Castro Street immediately in front of the plant at about 8 o'clock. He testified that at first he took the low-lying cloud to be merely a bank of fog, but as he drove on slowly he and his wife commenced to cough and their eyes smarted and presently she ceased to speak and he saw she had lost consciousness. They were then about 150 to 200 feet from Allied's south fence. He drove out of the smog bank and revived his wife. He then observed that the fumes came from the Allied stacks. After reaching their home a friend drove them to the Herrick Hospital. They were still coughing and short of breath and their condition was recorded at the hospital as a burning of the lungs. They were given oxygen there.

### Katherine Hagy's Case

At the outset of appellants' opening brief the admission is made that "For some time before December 21, 1949, Katherine Hagy had cancer of the larynx." However, her case was not diagnosed as cancer until after a biopsy had been taken in March, 1950.

Mrs. Hagy testified that she had suffered from an attack of laryngitis during July, 1949, but had recovered, and prior to December 21, 1949, was working every day in San Francisco in a position which she had occupied for three years. One of plaintiffs' doctors testified that he had talked with her before the smog incident and that her voice was then a perfectly normal feminine voice. After the exposure to the smog on December 21st, she lost her voice and her condition became pro-

gressively worse. She went to Dr. Barbosa, who referred her to Dr. Capus, an ear, nose and throat specialist, who noted a lesion in her larynx. After testing for tuberculosis he ruled that out and after the biopsy was taken her condition was diagnosed as carcinoma of the larynx. It was after this diagnosis that the laryngectomy was performed on April 30, 1950.

As already indicated, the theory of plaintiffs' case is (1) that Mrs. Hagy had a cancer of the larynx before her exposure to the smog but it had not been diagnosed as such, and her condition was such that she did not know it; (2) that her exposure to the smog and the irritation therefrom "lighted up" the dormant cancer; (3) that immediately following the exposure she lost her voice; (4) that her doctors then pressed their examinations, ruled out tuberculosis, took a biopsy of the larynx, and determined therefrom that she had a cancer of the larynx; (5) that a complete laryngectomy was then performed, and (6) *that such operation might have been averted had she not been exposed to the smog and the irritation therefrom.*

The legal concept of a case such as this appears in the Restatement of the Law of Torts as follows:

"§ 461. *Harm Increased In Extent By Other's Unknown Physical Condition.*

"The negligent actor may be liable for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct.

"Comment:

"a. The rule stated in this Section applies not only where the peculiar physical condition which makes the other's injuries greater than the actor expected is not known to him, but also where the actor could not have discovered it by the exercise of reasonable care, or, indeed even where it is unknown to the person suffering it or to anyone else until after the harm is sustained. A negligent actor takes the risk that his liability will be increased by reason of the actual physical condition of the other towards whom his act is negligent.

"Illustrations:

"1. Through the motorman's negligent management of the A Company's trolley car the control lever strikes the breast of B, a passenger. The injury is apparently slight, but it causes a cancerous tendency to 'light up' and localizes itself

in the injured point, requiring the amputation of B's breast. A is answerable for the harm caused by the cancer and the amputation.

"2. A, a schoolboy, during school hours, inflicts a slight kick upon the shin of B, a fellow student. Ordinarily the kick would have caused only a slight sensation of pain, but because of a latent infection it has serious consequences. A is liable to B for the full extent of his injuries."

Illustration number 1 seems to be an almost perfect example of the present situation.

Appellants do not challenge the rule of section 461 but they assert that "The evidence is insufficient to sustain the implied finding of a causal connection between the smog and the condition of . . . Mrs. Hagy." It is their contention "that there was no causal connection between the smog and Mrs. Hagy's cancer and that, *as a matter of law,* the testimony of the three physicians who testified for her was insufficient to support the implied finding of the jury that there was such a causal connection . . ." (Emphasis added.) This is the principal point in this case, and the language which we have emphasized calls upon this court, on appeal, to declare *as a matter of law* that the jury's implied finding of a causal connection cannot stand, on this record.

Courts are reluctant "to determine the question of proximate cause as a matter of law" (see *Bethlehem Shipbuilding Corp.* v. *Industrial Acc. Com.,* 181 Cal. 500, 504 [185 P. 179, 7 A.L.R. 1180]). ▪▪ We agree with appellants that the burden rested on respondents to prove that the sulphurous fumes generated by appellants' plant aggravated the preexisting cancer, but we are satisfied that whether or not this burden was sustained was for the jury alone to say, and that its finding in plaintiffs' favor was sustained by ample evidence. ▪▪ We also agree with appellants that the question whether sulphurous fumes such as those shown by this record will aggravate or "light up" a preexisting, dormant cancer, is a question for expert, not lay, evidence. However, in this case there was ample expert testimony and the weight to be given such evidence was, as in any other case, within the province of the jury.

Before discussing the medical testimony it seems proper to examine the authorities wherein similar problems of causation have arisen.

In *Shaw* v. *Owl Drug Co.,* 4 Cal.App.2d 191 [40 P.2d 588] the plaintiff sued for personal injuries sustained when the

metal door (lying flatwise) of a sidewalk elevator over which she was walking, arose suddenly, throwing her violently to the pavement. About four years before this accident she had been operated on for a cancer of the breast. Eight months after the sidewalk accident she suffered a collapse (spontaneous fracture) of the injured leg at the very spot of the earlier trauma. The question presented in the trial court was whether the sidewalk accident was the proximate cause of the collapse of the leg eight months later. It was claimed that the diseased condition of the femur was neither precipitated nor aggravated by the injuries received in the sidewalk accident but the natural sequence of the cancerous condition of the breast with which plaintiff had been afflicted four or five years before. The defense moved the court to strike out all evidence relating to the fracture of the femur, which motion was denied. Later the court refused to instruct the jury, as requested by the defendants, to disregard all such evidence. On appeal it was contended that these rulings were erroneous.

The court said (p. 194) : ''The sole question presented for determination by the appeal is, therefore, whether there are any circumstances established by the evidence which reasonably construed may be said to support the implied finding of the jury and the conclusion reached by the trial court in ruling upon the motion for new trial that there was a causal connection between the two injuries. In our opinion there are.''

At page 195, in speaking of the testimony of one of plaintiff's doctors, the court said: ''While he gave no definite, absolute opinion that the diseased condition of the femur at the point of fracture was precipitated by the injuries plaintiff received to the leg in the sidewalk accident, his entire testimony was such as to warrant such conclusion. Therefore, when it is considered with all the other circumstances established by the evidence, it is legally sufficient, in our opinion, to support the verdict. (*Ensign* v. *Southern Pac. Co.*, 193 Cal. 311 [223 Pac. 953] ; *White* v. *Red Mountain Fruit Co.*, 186 Cal. 335 [199 Pac. 318] ; *Averdieck* v. *Barris*, 87 Cal.App. 626 [262 Pac. 423].) As said in *Bethlehem Shipbuilding Corp.* v. *Industrial Acc. Com.*, 181 Cal. 500 [185 Pac. 179, 7 A.L.R. 1180] : '*The reluctance of the courts to determine the question of proximate cause as a matter of law* in cases similar to the instant case is illustrated by *Baltimore City Passenger Ry. Co.* v. *Kemp,* 61 Md. 619 [48 Am.Rep. 134], wherein it was held

that it was properly left to the jury to determine whether or not a supervening cancerous growth was caused by injuries sustained by plaintiff as a result of defendant's negligence. The evidence in this behalf was to the effect that the personal injury might have superinduced and contributed to the production and development of the cancer. The court quoted with approval from *Beauchamp* v. *Saginaw Mining Co.,* 50 Mich. 163 [15 N.W. 65, 45 Am.Rep. 30], wherein it was held that it was for the jury to determine whether or not a blow on the head was a proximate cause of death from pneumonia, the evidence being to the effect that the personal injury had so reduced the vitality of the deceased as to render him more susceptible to disease and less able to resist it. (Citing a number of authorities.)' '' (Emphasis added.)

Appellants' contention that the removal by surgery of plaintiff's larynx would have been necessary anyway and in any event, *without regard to the smog irritation,* parallels the contention unsuccessfully urged by the defense in the Shaw case that the collapse of the leg eight months after the sidewalk accident would have occurred in any event, due to metastasis from the breast cancer, *without regard to the sidewalk accident.*

The burden did not rest upon respondents to prove that the removal of respondent's larynx would not have been necessary but for her exposure to the smog; the burden was rather upon appellants to convince the jury that the operation would have been ultimately necessary in any event, even though the cancerous larnyx had not been traumatized by the irritation of the smog. (*Brown* v. *Beck,* 63 Cal.App. 686, 695 [220 P. 14].)

The Brown case, like *Bethlehem Shipbuilding Corp.* v. *Industrial Acc. Com., supra,* follows the Beauchamp case. There Brown was negligently struck down and injured by Beck's truck, and while on crutches in the hospital convalescing from those injuries he fell, breaking his neck, was immobilized, developed pneumonia, and died. The court said, page 695: ''Counsel for defendant concedes that decedent 'might not have died (when he did) if he had not been injured and required to move about on crutches.' But he endeavors to escape responsibility, arguing that 'it was not likely, nor was it proved, that death would not have come had he not been injured by the fall and thereby confined to his bed.' Such position is untenable. The party causing the injury cannot escape full liability without showing death must have re-

sulted if the injury had not been done.'' (Citing the Beau-champ case.) A hearing was denied by the Supreme Court.

 In the Beauchamp case, which *Brown* v. *Beck* follows, the court (15 N.W. 68-69) adopted the following statement from *Baltimore & P. R.* v. *Reaney,* 42 Md. 117: ''But it is equally true that no wrong doer ought to be allowed to apportion or qualify his own wrong; and that, as a loss has actually happened while his own wrongful act was in force and operation, he ought not to be permitted to set up as a defense that there was a more immediate cause of the loss, if that cause was put in operation by his own wrongful act. To entitle such party to exemption he must show not only that the same loss *might* have happened, but that it *must* have happened if the act complained of had not been done. *Davis* v. *Garrett,* 6 Bing. 716. . . .''

 Appellants argue that ''On the basis of Dr. Capus' testimony, the conclusion is therefore inescapable that Mrs. Hagy had a total laryngectomy, not because of her exposure to the smog, but because it took more than two months for her attending physicians to diagnose her condition properly. In fact, it may well be that, because of the exposure to the smog, Mrs. Hagy consulted a physician earlier than she otherwise would have and the tragedy of the case simply is that her physicians did not discover that she needed x-ray treatment until it was too late to give her such treatment.'' This is simply an attempt to shift responsibility onto a delay in properly diagnosing Mrs. Hagy's case and to give credit to the exposure to the smog for the diagnosis when it ultimately was made. It is another way of asserting that although the smog did not aggravate the preexisting cancer its effects were at least bad enough to put the doctors on inquiry as to a suspected cancerous condition. The reasoning of the authorities last cited (Beauchamp case and *Brown* v. *Beck*) are an answer to this argument.

Several doctors testified on behalf of the plaintiffs, and several on behalf of the defense. In the course of their testimony and of that of at least one other defense witness (a layman) the questions of ''concentration'' and the ratio of pure, clean air to air polluted by sulphurous fumes were gone into. The defense argues that the fumes emitted were so negligible as to be incapable of doing the damage claimed by plaintiffs to have been done. It was brought out by the cross-examination of appellant Compton that the log book of the plant for December 21, 1949, containing figures show-

ing "concentrations" of sulphur dioxide at points of "exit" from the plant had been sent, six or seven months before the trial to Allied's San Francisco office where, presumably, it reposed at the time of the trial. At any rate it was not produced, and hence it is to be presumed that (to put it mildly) it would not helped appellants' case. (Code Civ. Proc., § 1963, subds. 5 and 6; *Dierman* v. *Providence Hospital*, 31 Cal.2d 290, 293 [188 P.2d 12]; *Dahl* v. *Spotts*, 128 Cal. App. 133, 137 [16 P.2d 774] and cases cited; see, also, Code Civ. Proc., § 2061, subds. 6 and 7.) In its absence it would seem that any testimony based on the supposed strength or weakness of the "concentration" at 8 p. m. or thereabouts on December 21st would be highly speculative and of little, if any, probative weight or value.

■■■ The medical witnesses testified in part in answer to hypothetical questions, but the jurors had before them all the circumstances surrounding the plant at the time in question, circumstances which showed, among other things, that persons at *a considerable distance* from the plant were seriously affected whereas the plaintiffs were *immediately in front of the plant* and enveloped in a bank of supposed "fog" which was impregnated with sulphurous fumes. The testimony of the medical witnesses had to be taken in connection with all the other evidence.

In *Baltimore City Passenger Ry. Co.* v. *Kemp*, 61 Md. 74, 80* the court asks the question: ". . . upon what principle could the court properly withhold the matter from the jury . . . " and answers it by saying: "It was for the jury to determine, as matter of fact, whether the cancer did result from the injury received. And in determining this question *they were required to consider all the circumstances and coincidences of the case, in connection with the testimony given by the professional witnesses.* If therefore the subject was proper to be considered by the jury at all, we are clearly of opinion that there was evidence sufficient to be considered by them." (Emphasis added.)

---

*Baltimore etc. Co.* v. *Kemp* is cited in *Bethlehem Shipbuilding Corp.* v. *Industrial Acc. Com.,* supra, and in *Shaw* v. *Owl Drug Co.,* supra, as being reported in 61 Md. *619* [48 Am.Rep. 134]. However, the original decision in the Kemp case is reported at 61 Md. at page *74*. After that decision was filed a petition for reargument was made. In the meantime the Beauchamp case, *supra,* which the Kemp case cites, was published (see 61 Md. 621) and the second decision in the Kemp case was filed overruling the motion for reargument (61 Md. 619).

It is interesting to compare that with language found in *Shaw* v. *Owl Drug Co., supra,* at page 196: "In other words, the question of whether the subsequent injury was such or should be regarded as having its origin in an independent, intervening cause was a question of fact for the fact-finding body to decide *from all the circumstances*; and its conclusion must be sustained whenever there is, as here, any reasonable theory evidenced by the record on which its conclusion can be sustained. (*Bethlehem Shipbuilding Corp.* v. *Industrial Acc. Com., supra.*)" (Emphasis added).

Dr. Alfred Berkove testified for the plaintiffs. He is a graduate of the Medical School of the University of California, did postgraduate work in eye, ear, nose and throat at Washington University, St. Louis, and is a member of the American Otolaryngological Society. He practices his profession in Oakland.

On July 9, 1949, Mrs. Hagy consulted him complaining of a cold, sore throat and hoarseness. He made a routine examination, and examined her larynx, using a mirror. Her throat showed redness likewise the epiglottis, the cords and the rhetnoids. He found no evidence of cancer of the larynx at that time. His diagnosis was that she was then suffering from acute inflammation of the nose and throat and acute inflammation of the larynx. He treated her and directed her to return if she did not improve; she did not return. He next saw her in October, 1950, after her larynx had been removed. He testified that in a total laryngectomy, which this was, "the entire voice box, the larynx is removed," including the "Adam's Apple"—the whole thing, and after such an operation the patient can no longer speak. They can no longer breathe through the mouth or nose, but breathe through the tracheal opening. He testified that plaintiff now breathes through this opening (made by surgery) in her neck.

He testified that an intrinsic squamous cell carcinoma grade 2, which this was, develops rather slowly.

In answer to a hypothetical question by plaintiffs' counsel which concluded "Do you have an opinion as to whether or not there was any connection between exposure to the fumes that I have described, and the removal of Mrs. Hagy's larynx?" Dr. Berkove answered: "My opinion is that she had an intense burn of her larynx, either by sulphur dioxide or sulphur trioxide, because we know that either agent are very irritating to the normal tissues of the nose and throat.

In sulphur dioxide, which is a reducing agent, the form of inflammation is usually that of a granulation type inflammation. In the sulphur trioxide, the form of inflammation is that of corrosion, because the action of sulphur trioxide in water gives you sulphuric acid, which *of course tissue juices, plus sulphur trioxide will also form a sulphuric acid,* and the corrosive action would have caused a marked scarring of that larynx, and perhaps in a susceptible patient, could have either instituted the malignancy, or certainly hastened its growth.'' (Emphasis added.)

He testified further that if the cancerous growth is hastened the treatment must be radical in its nature and he believed ''that the rapidity of the growth of this tumor made it necessary for radical surgery . . . that the only chance of saving her life was to do a total laryngectomy''; that, in his opinion, had Mrs. Hagy not been exposed to the smog it would have made a difference in the treatment. That difference was that ''she would not have required an operation whereby she would have lost her voice''; and had the operation been averted she would still have a normal air passage. On cross-examination he gave this testimony: ''Q. Your theory is anybody breathing any gas, $SO_2$, the moisture in your mouth would form an acid? A. Yes. Q. And there is moisture in your mouth as well as your throat, isn't that so? A. Yes . . . Q. Is it your testimony, Doctor, that one exposure to a chemical can irritate a cancer or pre-existing lesion, or ulcer which is malignant? A. Yes, if it is irritated—if the material is irritating enough, it can. Q. Is it your testimony, Doctor, that a person who claims, as Mrs. Hagy claims that she inhaled some $SO_2$ gas, is it your opinion that that would irritate a pre-existing cancerous condition? A. It might . . . if it is concentrated enough.''

The testimony in the record that Mrs. Hagy's health had been good just prior to December 21st and that she became unconscious on entering the smog bank, was sufficient basis for an inference that the concentration of sulphur dioxide was in fact strong enough to cause her unconsciousness.

As was said in *Fireman's Fund etc. Co.* v. *Industrial Acc. Com.,* 93 Cal.App.2d 244, 246 [208 P.2d 1033] : ''expert evidence of a medical possibility taken with other evidence of a non-expert character may be sufficient to support an inference of a medical probability.'' And as said in *Alonso* v. *Hills,* 95 Cal.App.2d 778, 786 [214 P.2d 50] : ''Even regular scientific expert testimony is not entitled to preference

over testimony as to the facts; the relative weight must be decided by the trier of facts. (*Rolland* v. *Porterfield*, 183 Cal. 466, 469 [191 P. 913 ].)"

Dr. Bertram Capus, another eye, ear, nose and throat specialist, also testified for plaintiffs. His opinion was that the condition of Mrs. Hagy's mouth on January 5, 1950, "could well fit the picture of a chemical burn." He testified: "I definitely feel that exposure to this material, produced a chemical laryngitis, and an aggravation of any pre-existing condition she may have had."

Dr. Manuel Barbosa, a general practitioner, also testified for the plaintiffs. We see no reason, however, to quote further from the testimony of these doctors. It appears that the moisture in a person's mouth and nose will itself form a sulphuric acid when such person breathes sulphurous fumes (of a sufficiently high concentration). The medical history shows that immediately following December 21st Mrs. Hagy lost her voice and from there on she became progressively worse.

The opinions of the doctors aligned on the defense side differed from those on the plaintiffs' side. To again quote from the Shaw case (4 Cal.App.2d 196): "But at best their opinions raised merely a conflict; and as to what should be the true deduction from conflicting testimony is a problem for the jury and not the reviewing courts. (*Gambrel* v. *Duensing*, 127 C.A. 593 [16 Pac.(2d) 284].)"

Appellants also argue that there were conflicts within the testimony of the plaintiffs' own medical witnesses. Assuming that there were some differences, the rule in California as to conflicts "applies not only to a conflict between the witnesses for the respective parties, but between the witnesses for the same party [citations]." (*Dietlin* v. *General American Life Ins. Co.*, 4 Cal.2d 336, 344-345 [49 P.2d 590].)

### Russell Hagy's Case

It is conceded in appellant's opening brief that "For some time (for many years in fact) before December 21, 1949, Russell Hagy ... had a heart condition." There is considerable testimony in the record bearing upon the aggravation of this preexisting heart condition, and we think more than sufficient to sustain the verdict in his favor for $5,000.

Appellants however contend that it is insufficient. Since the complaint alleges damages to him in the sum of $10,000, as a result of being deprived of the services of his wife, and that "his comfort and happiness in her society and compan-

ionship have been greatly impaired," it is apparent in a case such as this that a verdict of $5,000 in his favor can be upheld as amply sustained by evidence in support of those allegations, even if there were no evidence sustaining allegations of aggravation of his heart condition.

The judgment is affirmed.

Dooling, J., concurred.

Jones, J. pro tem.,* deeming himself disqualified, has taken no part in the consideration or decision of this case.

A petition for a rehearing was denied January 29, 1954, and appellants' petition for a hearing by the Supreme Court was denied February 24, 1954. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.