[Civ. No. 16358. First Dist., Div. Two. Oct. 3, 1955.]

FRANCIS J. O'HEY, Respondent, v. MATSON NAVIGATION COMPANY (a Corporation), Appellant.

Brobeck, Phleger & Harrison for Appellant.

Masterson, Bernheim & Sugarman and Bernheim, Sugarman & Gilbert for Respondent.

KAUFMAN, J.—This is an appeal by Matson Navigation Company, a corporation, from a judgment of the Superior Court in and for the County of Contra Costa, entered on December 22, 1953, upon a jury verdict in favor of plaintiff and respondent in the sum of $11,460, plus costs. Motion for new trial was made and denied.

The case was submitted to the jury on a cause of action charging defendant corporation with unseaworthiness of the SS. Hawaiian Builder, the vessel upon which plaintiff was employed as a longshoreman at the time of his injury. A cause of action based on a claim of negligence was dismissed by plaintiff before the case was submitted to the jury. The amended answer denied the charging allegations of the complaint, alleged contributory negligence of plaintiff, and alleged that plaintiff's negligence was the sole cause of the accident.

Plaintiff and respondent, Francis J. O'Hey, was a longshoreman, employed by the Pacific Maritime Association. On March 26, 1952, he went with his crew to Crockett, California, where they went to work under the direction of Matson Terminals, Inc., a corporation engaged in the stevedoring business. They were required to assist in unloading a cargo of raw sugar from the hold of the vessel SS. Hawaiian Builder. Plaintiff and other longshoremen obtained tools before going aboard from the office of Matson Terminals, Inc. Longshoremen who desired to do so also obtained at this office loose fitting canvas boots 16 to 18 inches high which were worn over their shoes to protect them while working in the sugar. These boots were secured by two ropes, one around the ankle and one at the top. Respondent put on a pair of these boots before he commenced work.

In order to unload the bulk sugar it was necessary to remove the hatch cover from the Number 4 hatch on the 'tween

deck of the ship. The 'tween deck is the lowest deck of the ship, and immediately beneath it is the lower hold, approximately 16 feet in depth, which contained the cargo of raw sugar. Above the 'tween deck is the shelter deck, and above that the main deck. There is an opening through each deck in each hatch, estimated variously by the witnesses herein as 18 feet by 20 feet and 30 feet by 22 feet. On the shelter and 'tween decks the hatches open flush with the deck, while on the main deck the hatch is surrounded by 3-foot steel walls. The rim of the 'tween deck hatch is lined with steel 3 feet in depth downward from the level of the deck. This is called the coaming. Vertical ladders in the center of the forward and after ends of each hatch opening give access to the shelter and 'tween decks and lower hold.

The after end of the 'tween deck area in Number 4 hatch was a cargo storage area divided into port and starboard halves. A large circular stanchion in the midships line running from the top to the bottom of the ship, is immediately adjacent to the hatch coaming on the after side. A bulkhead runs aft from the stanchion on back to the bulkhead separating the Number 4 and Number 5 hatches. A cargo of canned pineapple in paper cartons had been taken on the ship at Kahului in the Hawaiian Islands. These cartons were stacked at the aft end of the lower 'tween deck from one-half to two-thirds of the way to the ceiling, and a wood fence of dunnage —four by fours—was built to hold the cargo in place. The shipment of pineapple was destined for Oakland and was not to be unloaded at Crockett.

During the course of unloading the raw sugar, respondent was required to scrape sugar from the edges of the coaming around the Number 4 hatch on the 'tween deck. The hatch covers had been removed by respondent and the other longshoremen on the shelter and 'tween decks, and the escalator put down into the sugar. Some of the sugar "kicks" out from the conveyor, and this necessitates the scraping. Respondent's work required him to work around the edges of the open hatch.

A space of 3 feet is customarily left between the edge of the hatch and stowed cargo. This 3-foot space is usually marked on the deck of Matson ships by white or yellow lines. There was testimony that Safety Rule No. 817 of the Pacific Coast Longshoremen's Agreement required a 36-inch space to be left clear around hatch coaming and to be designated by a proper marking in order to furnish clear space for handling hatch covers and strongbacks during covering and uncovering

operations. The jury was, however, cautioned that this was testimony to the effect that there was such a rule and a custom, but that the Matson Navigation Company was not a party to the agreement, and the rule was not obligatory upon them. The chief officer of the ship, Rathke, testified that Matson Terminals, in charge of stevedoring operations, have orders that clearances are to be 3 feet around hatch coamings and that it is regular practice to maintain that clearance.

The evidence was conflicting as to whether or not there was 3 feet of clearance between the hatch coaming on the aft end of the hatch and the cargo of pineapple. There was testimony that no yellow or white line was visible. Rathke, the chief officer, said that the lines were not visible, that they had probably been worn away. One witness stated that the space between hatch and cargo on this end was only 18 or 20 inches. Respondent said it was between 12 and 16 inches and that he had to walk in the area with his body turned.

Before noon on the day of the accident, one of respondent's fellow workers who was working on the aft end of the hatch asked him for a couple of scrapers. O'Hey, who was then on the port side, went down to the aft end, swung out over the ladder in the square of the hatch and handed the scraper to the other longshoreman. He could not go behind through an escapeway in the bulkhead at the aft end, as this escapeway was blocked by the cartons of canned pineapple. As the longshoreman did not want the second scraper, respondent laid it alongside the bulkhead at the end of the hatch and went to dinner. Respondent, when he returned, came down the ladder at the forward end of the hatch, walked along the port side and turned on the aft end in order to get his tools. After taking about three steps he slipped or tripped, grabbed at the dunnage fence surrounding the pineapple cargo in an attempt to get his balance, but the piece he grabbed broke loose and he fell into the hold.

There were no guard chains or rails around the hatch at the time of the accident. Stanchions and chain are standard equipment to provide a safety chain around hatches. The ship's first mate testified that there were sockets in the deck for the stanchions, that such stanchions and railings were available for every hatch on each deck of the ship. The first mate stated that the stanchions and the chain railing for the Number 4 hatch of the 'tween deck were in place behind the ladder in the hatch, between the ladder and the bulkhead. There is no question but that it was the duty of the steve-

doring company to put the chain guards in place after they had opened the hatch, but it was the duty of the ship to have such safety device available. Two longshoremen, Moisive and Lara, were questioned as to whether they saw any such guard railings either installed or lying around in the area of the Number 4 hatch. They said that they saw none. Respondent was asked whether he saw any such railing in that area "either in place or laying down in there." He answered, "No, sir, and there was no place there to make it fast either." Although appellant contends that there is no real conflict on the question that such safety devices were available on the ship for use by the stevedores, it appears that at least respondent's testimony that he saw no such devices in that area and that there was no place to make such a railing fast, does create a conflict with the mate's testimony that the deck contained sockets around the hatch in which to place the stanchions for a chain railing, and that they were available.

A hospital record containing a history given by respondent shortly after the accident stated that respondent said he fell because of the narrowness of the passageway and his clumsy oversize boots, and that there was no safety line around the hatch.

Respondent was hospitalized for about two weeks because of his injuries. He sustained a fractured rib, a minimal compressed fracture of the 11th thoracic vertebra, a contusion of the kidney, abrasions of the left arm, a concussion, and soft tissue injury to his back. He was fitted with a special type brace to support his back and was given physiotherapy. In November, 1952, respondent was examined by Dr. Burton, the compensation doctor, who found some muscle spasm in the lower back and some limitation of motion on forward flexion and some limitation of rotation of the hips. This doctor attributed some of the difficulty to degenerative arthritis that had existed prior to the injury, and some to the injury.

Dr. Harry Walker, an orthopedist, was of the opinion that respondent would be limited to light work permanently.

Respondent had earned $3,548.16 in the year prior to the accident. At the time of the trial, respondent was not doing work as a regular longshoreman but was employed as an extra boss, a lighter type of work. During the two months prior to trial he testified that he secured from a day to a day and a half of work in that capacity, although his employment in the prior months had been much steadier. He stated that there is not as much employment for extra bosses as for longshoremen.

Respondent's case rests on proof of lack of seaworthiness of the vessel in three respects: (1) that the passageway aft of the 'tween deck hatch was too narrow, being less than the customary 3 feet because of infringement on that space by the pineapple cargo; (2) that the fence alongside the pineapple cargo was defective and not secured, and that an inference could be drawn that it was intended also to serve the purpose of a handrailing in the narrow passage; (3) that no chain guard rail was supplied to protect the hatch opening.

In 1946 the case of *Seas Shipping Co.* v. *Sieracki,* 328 U.S. 85 [66 S.Ct. 872, 90 L.Ed. 1099], the United States Supreme Court decided that a longshoreman might recover from the owner of a vessel if his damages were caused by its unseaworthiness. Contributory negligence in such cases is not a bar, but merely reduces the recovery. (*Spencer* v. *Beadle S.S. Co.,* 4 Cal.2d 313 [48 P.2d 678], 298 U.S. 124 [56 S.Ct. 712, 80 L.Ed. 1082].) The warranty of seaworthiness is a species of liability without fault and is an absolute duty now held to be owing to stevedores as well as seamen. (See *Read* v. *United States,* 201 F.2d 758; *Mahnich* v. *Southern S.S. Co.,* 321 U.S. 96 [64 S.Ct. 455, 88 L.Ed. 561].) It cannot be seriously disputed, in view of the evidence reviewed above, that there was evidence to support an inference that the passageway was narrower than the customary 3 feet, that the dunnage fence surrounding the pineapple cargo was insufficient to make it serve as a support or handrail, and that the guard chains were not available for this hatch.

Appellant contends that there is no evidence that any of the above factors was the proximate cause of the accident, and also that the obstruction of the passageway by cargo and the flimsiness of the fence which was constructed to secure cargo and not to furnish a handrail, are not proof of lack of seaworthiness of the vessel. As to the availability of guard chains, appellant argues that the evidence that they were available is uncontradicted, but that contention has been previously disposed of, *supra,* where it was noted that there was conflicting evidence on this issue.

Appellant at the outset points out that the distinction between the warranty of seaworthiness and the duty to provide a safe place to work must be kept in mind. The warranty of seaworthiness is absolute. However, the obligation to furnish a business invitee on a ship with a safe place to

work had its basis in the common law dealing with master and servant. (Norris, The Law of Seamen, vol. 2, § 688.) The breach of such duty is an act of negligence. In the instant case the cause of action based on negligence was dismissed before the case went to the jury, therefore only the warranty of seaworthiness was properly before the jury.

▇ It is true, however, that negligent acts sometimes result in a ship becoming unseaworthy, and in such cases liability may be predicated on either cause of action. ▇ If, however, in a case such as this, there was a negligent act, but it did not result in unseaworthiness of the ship or its appurtenances, then there could be no recovery. In *Brabazon* v. *Belships Co.*, 202 F.2d 904, this distinction was noted, where the lower court was criticized for finding that defendant was derelict in its failure to "perform its nondelegable duty 'to furnish libellant with a safe place to work.' Apparently the provision of a 'safe place to work' was viewed as an absolute requirement rather than a rule of reason." In that case a board which was not shown to have been any part of the ship or supplied by the ship, broke under a stevedore's weight when he walked on it across a gap between two locomotives which were part of the cargo being loaded on the ship by his employer.

There is no question, judging from the evidence in this case, but that the 3-foot passageway is established as the customary safe passageway provided on ships for unloading operations. Here the refrigerators and bulkheads on the port, starboard and forward end of the hatches were 3 feet from the hatch. There is evidence that the cargo of pineapple in a solid wall on the aft end had narrowed considerably the passageway in which longshoremen would have to work. Gangways, other appliances, and passageways used by a seaman in doing his work were considered by the Supreme Court in *Mahnich* v. *Southern S. S. Co.*, 321 U.S. 96 [64 S.Ct. 455, 88 L.Ed. 561], as appurtenances of the ship, covered by the warranty of seaworthiness. ▇ The 3-foot passageway maintained on cargo ships is manifestly for the safety of longshoremen, to whom the warranty of seaworthiness has been extended. As far as they are concerned, then, a cargo ship without passageways of such width could certainly be held to be unseaworthy. ▇ It was also held in the Mahnich case, *supra*, that a finding of seaworthiness is usually a finding of fact. (See *Luckenbach* v. *W. J. McCahan Sugar Ref. Co.*, 248 U.S. 139, 145 [39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522].)

█ If the ship was in fact unseaworthy in this respect, then the owner is responsible, even though the stevedoring contractor may have been negligent toward his employees in leaving this condition unchanged when he had the power to correct it. █ "Seaworthiness" has been defined as the sufficiency of the vessel in materials, construction, equipment, officers, men and outfit for the trade or service in which it is employed. (*Martin* v. *The Southwark*, 191 U.S. 1 [24 S.Ct. 1, 48 L.Ed. 65].) "Seaworthiness" includes not only seaworthiness in hull and equipment but also in storage of cargo. (*Corsar* v. *J. D. Spreckels & Bros. Co.*, 141 F. 260 [72 C.C.A. 378].) The jury herein was so instructed.

Appellant complains that there were allegations of a slippery condition, and that there was no proof that there was any sugar or any slippery substance where respondent was walking when he fell. █ Liability for unseaworthiness cannot arise from a condition which the party himself has the duty to correct. █ There is no reason to presume that the jury based their verdict upon any such finding, as, first, there was no evidence in the record that there was any foreign substance on the deck, and second, the jury was instructed that the doctrine of unseaworthiness does not extend so far as to require the owner to keep passageways which are inherently sound and seaworthy absolutely free at all times from transitory unsafe conditions resulting from their use. Furthermore, they were instructed that if the ship was seaworthy and a safe place to work when the stevedoring contractor assumed control of the work, the shipowner was not thereafter liable for negligent acts of the stevedoring contractor or its employees. █ And, "where injury to a person working aboard ship is proximately caused by his failure to perform his known duty he cannot recover."

█ Appellant maintains that the dunnage fence, a piece of which broke off in respondent's hand when he grabbed for it to restore his balance, was clearly for the purpose of securing the cargo of pineapple, and was intended for that purpose alone, hence the ship was not unseaworthy if it did not served as a secure handrail. Respondent argues that the jury could infer, however, that the dunnage fence was to serve as a hand hold in such a narrow passageway. It is hardly probable that the jury based a finding of unseaworthiness on the breaking of the dunnage fence, since the testimony was that this rail was at a height of between 5 and 6 feet from the deck, and respondent reached above his head to

grab it as he was falling. No reasonable person could infer that a fence placed at that height was intended to be used as a banister, and its purpose, certainly to longshoremen, was obvious. It was a reasonable inference that the narrowness of the passage was a cause contributing to respondent's losing his balance. He was wearing clumsy oversized boots which were customarily worn in this work. It was reasonable also to infer that respondent would not have suffered serious injury if the guard rail had been present to prevent his falling the 16 to 20 feet into the hold. As we have noted above, there was a conflict in the evidence on this issue. Appellant does not deny that the failure to furnish such a safety device would constitute unseaworthiness. There is therefore sufficient evidence in the record to support a finding that unseaworthiness of the vessel was a proximate cause of the accident.

Proximate cause is generally a question for the jury. They may draw reasonable inferences from the evidence. (See *Hagy* v. *Allied Chemical & Dye Corp.*, 122 Cal.App.2d 361 [265 P.2d 86] ; *Helmke* v. *United States*, 8 F.Supp. 521.)

Appellant contends that the jury disregarded proper instructions and uncontradicted evidence, that any unsafeness in respondent's place of work resulted from acts of his own employer and its agents or employees while his employer had control of the place of work. The jury were here instructed that the shipowner had the duty to provide a safe place to work for the longshoremen coming aboard his ship, but that such duty terminated when the longshoremen's employer took control, that if the ship was seaworthy and a safe place to work when the work began, the shipowner was not liable for negligent acts committed by the stevedoring contractor or its employees after that time. Appellant apparently overlooks the fact that the jury here could have found that the stevedoring contractor was negligent in not removing part of the cargo in order to provide the customary 3-foot passageway, but could also have found that the ship was unseaworthy in not having available the hatch guard rails for the stevedore's use. If cargo improperly stowed can constitute unseaworthiness, then the temporary wall of cargo which-infringed on the safe passageway, could also have constituted unseaworthiness contributing to the injury. The fact that another's negligence may also have been a contributory factor will not excuse the shipowner from his absolute liability on the warranty of seaworthiness if unseaworthiness was in any way a causative factor. The cargo of pineapple here

was loaded in the Hawaiian Islands and was not to be removed until the ship reached Oakland after the cargo of sugar had been unloaded at Crockett. The fact that Matson Terminals had authority to alter the condition of the ship's cargo does not relieve the shipowner from his duty to maintain a ship that is in all respects seaworthy. Appellant's argument that the hatch was not open when the longshoremen took over, and that therefore the ship was then a safe place to work cannot be seriously considered. This was a cargo ship from which the sugar could not be unloaded without the hatch being opened and the passageway being used. Appellant might as well argue that the guard chains which such ship must provide to safeguard hatches are also no element in the seaworthiness of a ship, since the hatches are closed and not dangerous when the longshoremen take over.

It is argued that the jury also disregarded proper instructions and uncontradicted evidence that respondent with knowledge that a safe route was equally accessible, voluntarily chose to subject himself to whatever danger existed by using a route whose condition was perfectly obvious to him, and which he now claims was unsafe. It is well established that where longshoremen choose an unsafe way when a safe way is open to them, they cannot recover. (*Long* v. *Silver Line, Ltd.*, 48 F.2d 15; *Hardie* v. *New York Harbor Dry Dock Corp.*, 9 F.2d 545; *The Hindustan*, 37 F.2d 932.) Appellant apparently overlooks the fact that the entire aft end was, according to respondent's witness, considerably less than the required 3 feet in width. As part of his work, he had to go to that part of the area surrounding the hatch to give the other longshoreman the tool requested, and his own duties required him to work on that side as well as the other three sides of the hatch. Respondent testified that the aft end of the hatch coaming had not been scraped and that he was told to do it. Appellant also overlooks the fact that the entire hatch area where respondent was required to work was made dangerous by lack of the chain guard rail.

Appellant complains that contradictory instructions were given to the jury regarding the doctrine of seaworthiness and that concerned with the furnishing of a safe place to work. The following instructions were given:

"You are instructed that in maritime law 'seaworthiness' is defined as the sufficiency of the vessel in materials, construction, equipment, officers, men, and outfit for the trade or service in which it is employed.

"You are instructed that a 'seaworthy ship' is one in a fit state as to repairs, equipment and crew, and in all other respects, to encounter the ordinary perils of the sea. It is the equivalent of common-law obligation of an employer to furnish his employee with suitable appliances and a safe place to work.

"The doctrine of unseaworthiness does not extend so far as to require the owner of a ship to keep appliances and passageways, which are inherently sound and seaworthy, absolutely free at all times from transitory unsafe conditions resulting from their use.

"You are instructed that 'seaworthiness' includes not only seaworthiness in hull and equipment but also in the stowage of the cargo.

"You are instructed that failure to maintain safe and adequate passageways on a vessel to permit necessary work may constitute unseaworthiness.

"The obligation on the part of a ship owner to use reasonable care to furnish seamen with a reasonably safe place to work and with reasonably safe appliances with which to work, is not only a positive and continuing duty, but also a duty which is not delegable, that is, it is a duty which the law does not excuse the ship owner from fulfilling on the ground that he might have delegated this duty to some other person, as it is a direct obligation on the part of the ship owner.

"The duty of a shipowner to an individual employed by another and brought onto the ship to work is not the absolute duty of an insurer. The duty of the shipowner to such a person is only the duty of furnishing seaworthy conditions under the circumstances and the shipowner is liable for injuries to such person only when there is proof of a breach of that duty.

"It is the duty of the owner of a ship to supply a seaworthy vessel for its longshoremen engaged in unloading cargo. This duty does not depend on the exercise of reasonable care, but is absolute."

Since the cause of action for negligence of the shipowner had been dismissed, the instructions to be correct would have to be based entirely on the doctrine of seaworthiness. As noted earlier, many of the cases cited by respondent were cases brought on the theory of negligence of the shipowner. The cases involving longshoremen which arose prior to the Sieracki case, *supra,* necessarily were brought on the theory of negligence for violation of the common law duty of furnishing

a safe place to work and safe working equipment, for it was not then known that the doctrine of seaworthiness extended to longshoremen. Since that time there has been great confusion in the language in the federal cases. (See 39 Cornell Law Quarterly 409.)

Appellant admits that the correct definition of seaworthiness was given, but claims that the statement that "It is the equivalent of common law obligation of an employer to furnish his employee with suitable appliances and a safe place to work" is erroneous. This language is almost a direct quotation from the definition of seaworthiness stated in *The Waco*, 3 F.2d 476, which was cited with approval in *Rederii* v. *Jarka Corp.*, 82 F.Supp. 285, cases which appellant admits involved true unseaworthy conditions.

The instruction that "failure to maintain safe and adequate passageways on a vessel to permit necessary work may constitute unseaworthiness" is criticized as misleading, since the inadequacy must be caused by some inherent defect in the ship or its equipment, and it is not necessarily unseaworthiness even though it might be the result of negligence. However, appellant's definition of seaworthiness appears to be too limited, for even proper stowage of cargo has been considered an element of seaworthiness, and appellant has not criticized the instruction which so informed the jury. As noted earlier, the United States Supreme Court, in the Mahnich case, held seaworthiness to be a question of fact. At appellant's request the jury was instructed that the doctrine did not require the shipowner to keep appliances and passageways "which were inherently sound and seaworthy, absolutely free at all times from transitory unsafe conditions resulting from their use." Instructions were also given that "where there is no inherent defect in a ship and appliances made available to the stevedoring contractor, the shipowner is not liable for the failure of the stevedoring contractor to make use of the appliances" and further that "if the ship is seaworthy and a safe place to work is provided the longshoremen when their employer assumes control and they begin work, the responsibility of the shipowner ceased." This latter instruction is probably too favorable to appellant, inasmuch as the Ninth Circuit in the case of *Pettersen* v. *Alaska S. S. Co.*, 205 F.2d 478, rejected the "relinquishment of control" doctrine as unsound.

Appellant agrees that the instruction that the duty to furnish a seaworthy vessel is absolute, and does not depend

upon the exercise of reasonable care, is correct, but contends that other statements concerning "due care" must have misled the jury. This, it is claimed, reached its worst expression in the instruction that "The law imposes upon the ship owner the absolute and nondelegable duty of furnishing a seaworthy ship and reasonably safe equipment and appliances, and a safe place in which to work, and if a longshoreman unloading cargo suffers injury through the failure of the owner to perform such duty, the owner is liable to him in damages."

■ Shortly after this the instruction was given that "The duty of a shipowner to longshoremen employed by another employer to work aboard ship is to use reasonable care to provide a safe place to work" and that that duty terminates when the contracting stevedore takes control of the area. Since the later federal cases appear to use "seaworthiness" and a "safe place to work" synonymously, this instruction stated the appellant's duty too favorably. The Sieracki case, *supra*, held the shipowner liable on the warranty of seaworthiness for defects which a reasonable inspection would not have disclosed. ■ Appellant cannot complain that instructions were too favorable to itself. (*Williams* v. *Southern Pac. Co.*, 110 Cal. 457 [42 P. 974].)

■ There appears to be no merit in the contention that the damages awarded were excessive. Respondent was a married man, 45 years of age at the time of the accident, with four foster children. He had previously been in good health and working as a longshoreman. There was expert medical testimony to the effect that he would in the future be permanently limited to light work. His life expectancy was 25.57 years. The award of $11,460 damages for permanent disability therefore, does not appear to be excessive, or an abuse of discretion by the jury. (*Rodenberger* v. *Frederickson*, 111 Cal.App.2d 139 [244 P.2d 107].)

In view of the foregoing, we are satisfied that the judgment finds ample support in the record before us and that no prejudicial error appears therein.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied November 2, 1955, and appellant's petition for a hearing by the Supreme Court was denied November 30, 1955. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.