## JOHNSON v. UNITED STATES.
### No. 205.

Circuit Court of Appeals, Second Circuit.
Jan. 7, 1935.

Martin Conboy, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. to U. S. Atty., of New York City, of counsel), for the United States.

Simone N. Gazan, of New York City, for libelant-appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

PER CURIAM.

This is a libel in admiralty filed under the Suits in Admiralty Act of 1920 (46 USCA § 741 et seq.) to recover damages for the death of Harvey Johnson. The latter was a seaman on the motor ship West Honaker, a vessel belonging to the United States, who was washed overboard July 9, 1929, in the Indian Ocean during heavy monsoon weather, and died shortly after being rescued. The suit was brought by the father as administrator of the estate of the deceased seaman, and was based upon alleged negligence of the United States in failing to provide safeguards for members of the crew and in failing to take proper steps to rescue the seaman after he was carried overboard.

The West Honaker was a three island type of vessel operated by the Roosevelt Steamship Company for account of the Emergency Fleet Corporation. She had forward and after well decks, a raised forepeak, a raised middle section, and a raised after part. The sleeping quarters of the decedent were in the poop, and the messroom was in the midship section. In order to get from the sleeping quarters to the messroom, the crew could either traverse the after well deck or go below deck through the shaft alley.

About 5 p. m. on July 9, 1929, while Harvey Johnson and several other seamen were crossing the after well deck on their way to supper, a wave coming from the port side of the vessel washed across that deck and carried Johnson overboard. The well deck had a chain railing on each side, but had no life lines installed at the time Johnson was washed overboard.

The trial court held the respondent guilty of negligence in failing to rig life lines on the well deck, but halved the damages because it found the decedent negligent in choosing a path "which was obviously fraught with danger" when "there was another means available to him, of which he knew." Not only was no order given to the seamen to go to their messroom across the exposed well deck, but the crew had been given general admonitions not to go over the open deck, but to use the shaft tunnel in such rough weather as existed at the time of the accident.

■ A seaman to whom two ways were available, one dangerous and the other safe, assumed whatever risk was involved in taking the dangerous course when he selected it through his personal choice and not because of any compulsion or ignorance of the situation. To find him negligent in crossing the well deck, as the trial judge did, and at the same time to hold that he did not assume the risk of such an obviously unsafe passage, was quite contrary to the whole doctrine of assumption of risk applicable to such cases and explained in our recent decision in Holm v. Cities Service Transp. Co., 60 F.(2d) 721, where the very question we have here arose. Accordingly the libel should have been dismissed unless the libelant was able to show that the respondent failed to take proper steps to rescue the seaman after he was washed overboard. The trial judge found no negligence in connection with the attempted rescue, and, after a perusal of the evidence before him, we can see no reason for differing with his conclusion.

■ The libelant insists that the master of the West Honaker ought to have lowered a lifeboat as soon as Johnson was seen in the water instead of trying to make a lee, bring the ship up to him, and lift him on board. At this late day, removed from the exigencies of attempting to rescue a man overboard in a raging sea, it is easy to theorize about which was the wiser course. While the poor seaman remained afloat for an hour before he was lifted lifeless on board, after being first sighted, he twice disappeared in the high seas and was out of sight for long periods of time. Had the lifeboat been launched, it would have been necessary to risk her crew and to divide attention between looking out for their safety, directing their maneuvers, and navigating the ship with reference to both them and the man overboard. It was quite impossible to know whether, if the lifeboat had been lowered, the seaman would have remained in sight or would have kept on the same side of the ship as the boat. The crew of the latter had no such chance of keeping the man in sight as the ship which rode so much higher. Both the experts and the lay witnesses differed as to what mode of navigation was wisest under the circumstances. Upon evidence so conflicting, we are in no position to say that the master acted negligently and that his best judgment exercised on the spot lacked

fair justification. The Clarence L. Blakeslee, 243 F. 365, 366 (C. C. A. 2); The Nannie Lamberton, 85 F. 983 (C. C. A. 2); The Harold, 287 F. 757, 758 (D. C.); Olsen v. Luckenbach, 238 F. 237 (D. C.). See, also, The Eli B. Conine, 233 F. 987, 988 (C. C. A. 2). He was performing his duties under trying circumstances, and in spite of his age and recent illness was at all times zealously directing from the bridge the navigation and doing what he deemed best calculated to save the life of the seaman and safeguard his own crew. After making ready to lower a lifeboat he decided that it was better not to risk the crew of the lifeboat or to attempt a slow maneuver with a boat and oars in such a raging sea, but to rely on the quicker movements of his ship to come up to the windward of the seaman and hoist him on board.

The turbulent seas which so often hid Johnson from view unhappily prevented the plan adopted from being a complete success, but nothing the master did showed inefficiency, lack of diligence, or bad seamanship. Indeed, the fact that he finally recovered the seaman in the precise way he had planned is at least some justification for the choice of means of rescue selected. While the maneuvers took so long that Johnson became exhausted and finally succumbed, this was because during about forty minutes out of the hour he was in the water the great seas hid him from view and his rescuers in all that time could do nothing to help him.

The decree is reversed, and the libel dismissed.