## BOHANNON v. UNITED STATES.

United States District Court
S. D. New York.
March 2, 1950.

George J. Engelman, New York City, proctor for libelant.

Irving H. Saypol, United States Attorney, New York City, proctor for respondent (Barry, Wainwright, Thacher & Symmers, New York City, of counsel; Joseph M. Brush and Edward C. Kalaidjian, New York City, Advocates).

LEIBELL, District Judge.

The libelant, William T. Bohannon, was injured when struck by a sea, while crossing the forward well deck of the S. S. Four Lakes about 11:30 A. M. on December 19, 1947. The vessel was a tanker of the T-2 type and was owned and operated by the respondent. She was proceeding off the Florida coast, in the vicinity of Jupiter Lighthouse, on a voyage with a full cargo of oil, from Beaumont, Texas, to Staten Island, New York. Libelant was eighteen years old at the time. He had been going to sea about two years and had served on other tankers of this type. This was his fourth round trip on the S. S. Four Lakes.

The vessel was on a course of almost due north and was making about 15 knots. The wind was north and northeast, with a force of about 5–6 at 8 A. M. and a force of 4 at noon. At 7 A. M. the weather was overcast, there were "rain squalls and choppy seas". At noon the weather was cloudy and the vessel was "taking seas fore and aft". During the morning the seas had gradually increased in intensity and at the time of the accident seas were breaking across the forward main deck at an angle from the starboard side and spray was blowing over the bow.

The S. S. Four Lakes had a forepeak structure which was about 10 feet higher than the main deck, or well deck. A steel catwalk, with a grilled walk, and railings on the side, extended about 8 feet above the main deck, from the forepeak back to the midship house, a distance of about 125 feet. From aft of the midship house another similar catwalk extended back to the poop at the stern. The tanker was fully loaded and had a freeboard of about 6 feet.

On the main deck there were various tanks, about 5 feet high. A photograph (Ex. 2C) plainly shows three of the four on the port side of the forward well deck. The No. 2 tank was near the foot of a steel ladder which extended down from the catwalk at a point about 58 feet from the forepeak, a little more than half the distance between the midship house and the forepeak. Tank No. 3 was about 35 feet forward of the midship house. Tank No. 4 was near a ladder that came down the midship house, as shown on the photograph, Exhibit 2H.

There were two steel ladders that led down from the forepeak to the well deck; one was about 9 feet to the left of the forward end of the catwalk at the forepeak. There was a railing all around the forepeak. The railing joined up with the railing of the catwalk and the railings of the ladders which led down to the well deck. There was a door leading into the forepeak, about 10 feet from the foot of the ladder. On the morning of the accident, it was open, as shown on the photograph, Exhibit 2C.

That morning the bosun put some of the crew to work in the forepeak chipping and painting. Bohannon was one of them. About 10 o'clock several of them started aft over the well deck to have coffee. The Captain shouted at them and gestured, that they should use the catwalk. They turned back and went up to the catwalk and followed his orders.

Bohannon saw the Captain gesticulating at them. He said he did not hear him. But he must have known what the Captain meant. He says the men did not turn back, but continued on across the well deck. That is contrary to the Captain's version and does not seem probable.

After Bohannon had coffee, he used the well deck from the midship's house to the forepeak to get some paint. After getting his paint pots and brushes he came back

from the forepeak over the well deck at about 10:30 A. M. As he approached the midship house the third officer came out to the after end of the bridge and shouted to him to use the catwalk. Bohannon admits this warning.

About 11:20 that morning, Bohannon told the bosun that spray was coming around to the port side of the poop deck of the after house, where he was painting. It was not advisable to continue painting. The bosun told Bohannon to take his pots of paint and his brushes and take them to the paint locker in the forepeak and to tell the men there to knock off. The bosun did not tell Bohannon which route to follow in going to the forepeak. The following findings of fact describe what happened:

"14. Libelant proceeded from the after-house to the midship house by crossing on the elevated catwalk between those two structures. He walked around the port side of the midship house on the officers' deck and paused at the top of a ladder leading from the port forward side of the midship house down to the forward main deck or well deck.

"15. As libelant paused watching the seas breaking over the main deck, there were three routes by which he could proceed to his destination, the paint locker in the forepeak on the main deck level.

"(a) One route was to descend the ladder where he was standing and run the entire length of the forward main deck to the forepeak, a distance of about 120 feet. The waves breaking over the forward main deck made this route hazardous and libelant had been warned twice by the officers of the vessel on that morning not to use it.

"(b) An alternative route was for libelant to proceed from the midship house to the foc's'le head on the catwalk between those two structures. The catwalk had a grilled steel walk-away and two steel hand rails on either side. It was elevated about 8 feet above the forward main deck. At the foc's'le head, which was 10 feet above the main deck, libelant could turn to his left, walk about 9 feet with another railing for protection and descend a ladder to the main deck only 10 feet from the door to the forepeak. That ladder was sheltered by the sheer of the ship's skin from the main deck up to the forepeak level and by the 10 feet break at the aft end of the foc's'le head deck. That route was safe.

"(c) A third alternative was for libelant to go up the forward catwalk a little more than half way, and descend a ladder leading off the catwalk at that point to the port main deck in the vicinity of No. 2 port tank. From the bottom of the ladder to the forepeak door, a distance of about 58 feet, the port main deck was sheltered by the ship's line handling winch, the pump house and the raised forepeak. This route was not hazardous. It was reasonably safe, but it was not as safe as using the catwalk all the way.

"16. Libelant chose the first route to go all the way across the main deck, against which he had been previously warned by two of the vessel's officers. When he had advanced about 35 feet up the forward main deck from the foot of the midship house port ladder, a large sea broke over the main deck from the starboard side. Libelant dove for a pipe at No. 3 tank to secure himself, but failed to grab it before the sea struck him and washed him down the deck against some pipes, fracturing the radius of his left arm.

"17. After the wave subsided, libelant got up and ran to the forepeak. His fellow crew men brought him from the forepeak via the catwalk to the purser's office.

"18. At the purser's office, Bohannon received first aid treatment from the master and chief officer and told the master he had crossed the main deck (contrary to his warnings) because he though he could make it."

When the tanker arrived in New York on December 22d, Bohannon was sent to the Stapleton Marine Hospital. The radius of his left arm had been fractured. An attempt to set it by a closed reduction did not produce any union. It was decided to operate. As a result of the operation there developed a paralysis of the dorsal interosseus nerve, so that his fingers could not be properly extended and there was a loss

of pronation and supination. He cannot do any manual work which requires him to grasp anything. His hospital treatment, and treatment as an outpatient, continued for a period of about 15 months. He has been paid maintenance in full, $1,319. His medical care was given without charge at a government hospital for seamen. The claim for maintenance and cure, the second cause of action alleged in the libel, was withdrawn at the trial.

The first cause of action is based on negligence. The negligence charged is that the bosun at a time when it was dangerous to go to the forepeak, ordered Bohannon to take his paint pots to the forepeak and to tell the men who were working there to knock off. Libelant's counsel argues that the paint pots could have been placed at hand elsewhere, and that the men could have been called from the forepeak by a megaphone. The whole charge of negligence is based on the false assumption that there was no safe route to the forepeak at the time, because of the sea. The fact is that there was an absolutely safe way across the catwalk from the midship house to the forepeak; and there was a reasonably safe way by using the catwalk half way and the well deck for the latter half of the distance to the forepeak. There was no negligence on the part of any of the officers or crew. The tanker was seaworthy. Bohannon's accident was due solely to his own recklessness. The cause of action based on negligence is without merit.

There is no "element of coercion" in this case. Bohannon was free to select any one of the three routes in going to the forepeak. The bosun did not tell him which route to select. The route Bohannon selected, to go the full distance across the well deck, was dangerous because of breaking seas. Bohannon knew it was dangerous. He had been twice warned against using the well deck that morning, by both the Captain and the third mate. In using it despite the warning he was taking a chance. He said he thought he could make it. Unfortunately, he did not. He had covered only one-third the distance when he was knocked down and swept aft on the deck by a sea from the starboard side.

The following quotation from Holm v. Cities Service Transp. Co., 2 Cir., 60 F.2d 721 at p. 722 is applicable: "Where the conduct of the injured seaman, however, is induced only by his own free will, and he acts to his injury at a time and place when he is free to choose between doing what is safe and what is known to him to be dangerous, he is obviously under no more compulsion than is an employee on land."

In Johnson v. United States, 74 F.2d 703, 704, which is very similar to the facts in the case at bar, the Circuit Court of Appeals, Second Circuit, stated: "A seaman to whom two ways were available, one dangerous and the other safe, assumed whatever risk was involved in taking the dangerous course when he selected it through his personal choice and not because of any compulsion or ignorance of the situation."

The Johnson case was cited with approval in Socony Vacuum Co. v. Smith, 305 U.S. 424 at p. 430, 59 S.Ct. 262, 83 L.Ed. 265. The maintenance that libelant has received, a total of $1,316 is much less than he would have received for his injuries under any fair seamen's compensation act. As stated in Hust v. Moore-McCormack Lines, 328 U.S. 707 at p. 715, 66 S.Ct. 1218 at page 1222, 90 L.Ed. 1534: "Wisely or unwisely, they [seamen] have steadfastly preferred the traditional remedy of jury trial for negligence to workmen's compensation based on liability without fault."

In Farrell v. United States, 336 U.S. 511 at p. 518, 69 S.Ct. 707, at page 710, 93 L.Ed. 850: the Court noted: "When Congress has had under consideration substitution of a system of workmen's compensation on the principles of the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, as amended, 33 U.S.C. §§ 901–950, 33 U.S.C.A. §§ 901–950, organized seamen, as we have heretofore noted, have steadfastly opposed the change."

In suits under the Jones Act, 46 U.S.C.A. § 688, some seamen have recovered large verdicts. But their fellow seamen who

have been nonsuited are left without adequate compensation for their injuries. Of course, they receive maintenance and cure. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. But that does not meet the situation where a seaman has been permanently disabled by an accident which occurred solely through his own negligence. It seems to me that a fair and flexible seamen's compensation statute should be enacted in the interest of all the seamen.

I am filing herewith findings of fact and conclusions of law. The libel is dismissed on the merits.