Edward MANERA, Libellant,

v.

UNITED STATES of America, Respondent, and Bethlehem Steel Company, Respondent-Impleaded.

No. 19439.

United States District Court
E. D. New York.

Sept. 22, 1954.

Macklin, Speer, Hanan & McKernan, New York City, proctors for libellant, by Leo Hanan and Martin J. McHugh, New York City, advocates.

Leonard P. Moore, U. S. Atty., for Eastern District of New York, Brooklyn, for the United States, by Howard F. Fanning, New York City, advocate.

Arthur V. Lynch, New York City, proctor for respondent-impleaded, by Edmund Lamb, New York City, advocate.

BYERS, District Judge.

This libellant seeks to recover damages for injuries sustained on October 6, 1948, five and one-half years before the trial, when he fell from a ship's ladder while descending from 'tween decks to lower hold No. 5 on the U. S. Army Transport Private Frederick Murphy. The ship lay at a pier in the yard of Bethlehem

Steel Company, respondent-impleaded, at 56th Street, Brooklyn.

She was to undergo repairs for bottom damage caused by grounding on a rock, to effect which it became necessary to pump fuel oil from the tank under lower hold No. 5 and the shaft alley, because of the rupture of the ship's bottom so occasioned. That operation as decided upon, called for fixing port and starboard hoses to tank vent pipes in that lower hold, and the use of suction pumps connected to each hose, so that the oil would be so conducted overside into The Patco, a sludge barge which lay alongside The Murphy, on which the pumps were rigged.

This particular job was the subject of a sub-contract between Bethlehem and The Salvage Process Corporation, by whom Manera, the libellant, was then employed.

The attachment of the hoses to the vent pipes required the cutting away of a portion of the latter, which was done on October 5th in the early afternoon by employees of Bethlehem. The necessity for this method of procedure seems to have resulted from an inspection of the ship promptly after her arrival at the Yard on October 4th, when it was realized that oil leakage through the ruptured bottom would interfere with proper drydocking; present were representatives of the Yard, the Maritime Commission, the Coast Guard and the Army Transport Service.

The lapse of time until July 2, 1952, when the impleading petition was filed, may explain why the men who did the cutting of the vent pipes for Bethlehem were not called as witnesses.

The rigging of the two hoses was performed by employees of Salvage, and in details important to libellant's cause the testimony of two of them was vague and uncertain.

The opening of No. 5 hatch at the main deck measured 25 feet fore and aft, and 22 feet 4 inches thwart-ship. At the 'tween deck level the former dimension was 33 feet, which means that the open-ing there extended 8 feet further aft than at the main deck, the width however was the same.

The lower hold was reached from 'tween decks, by vertical ladders, which were part of the ship's structure, one at the forward end of the hold, which was a lower section of one leading from the main deck, and the other, at the port side, which was the one used by libellant and from which he fell while in the act of descending, at about 3:00 A.M. on the date stated.

The ladder was formerly the lower section of one similar to the forward ladder, also leading down from the main deck, but its upper section had been removed during the year 1947 to make room for cargo in the 'tween deck. The top of the said lower section was about six inches short of being flush with the 'tween deck level; in using that ladder a man would lack the handholds while at or near its top, which the upper section formerly provided; however, two so-called angle irons 4″ by 6″ about 7″ apart and about 10″ from the side of the hatch opening were riveted to the 'tween deck directly above the top of this ladder, and the testimony shows that these were grasped by men in ascending and descending, in lieu of the support formerly to be found in the lower rungs of the upper section. Whether those angle irons were part of the original structure of the upper section is not the subject of testimony.

It is the inadequacy of these angle irons as a medium of support to one using this ladder, upon which libellant relies to sustain his claim that the ship was unseaworthy, and that it failed to provide him with a safe place in which to work.

█ Since he was not a seaman and was not exposed to the peril of descending from the 'tween deck into this lower hold while the ship was rolling or pitching on the high seas, the test to be applied must be that of what a business guest was entitled to exact of the ship, while in the performance of such a task

as he was engaged in while the ship was lying at this repair yard dock. It is believed that the foregoing is a correct statement in view of all that was written in Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202.

Since there is no contested issue of fact, it will be unnecessary to burden the the record with itemized findings; the following recital is adequate to expose the entire controversy.

The libellant was 28 years of age at the time of his accident, 5 feet 9 or 10 inches in height, had several years of experience as a tank cleaner, was thoroughly familiar with ship's ladders, had used them many times in his calling and while serving in the U. S. Navy for three years; his rating at discharge was Shipfitter, Second Class. He had had two years of high school education, seemed to be intelligent, and his demeanor as a witness created a favorable impression.

There is no doubt that he fell from this ladder to the bottom of the hold, landed on his feet, suffered a comminuted fracture of the left tibia and fibula, and so injured the ankle bone as to incur a limitation in the functions of the joint itself which is permanent and may require surgical treatment in the future to be alleviated. He was unable to resume his former occupation, but sought reemployment in October, 1950, and is now an inspector in a machine shop and is "making considerably more than he ever made in ship cleaning."

The job he was doing on The Murphy was to watch the hoses in lower hold No. 5 after they had been joined to the vent pipes, to detect possible leaks or other failure of performance of the gear which had been described.

He said that he was one of a gang of eight, who worked for 24 hours, two men at a time, 3 hours on and 3 hours off. His first trick on The Murphy began at 3:00 P.M. on October 5th and continued until 6:00 o'clock; he resumed at 9:00, left at midnight and returned at 3:00 A.M. on the 6th and in making his descent at about that time, suffered the injury giving rise to the suit.

He received compensation and medical and hospital charges until March 1950, following an examination by a doctor for the Compensation Service, at which time he was walking without a cane. This libel was filed during the following month.

The lay witnesses for the libellant in addition to himself were Olsen, the foreman of another gang, and Bragger, an oil tank cleaner in Olsen's gang, LeCato, second officer on The Murphy, and Finkenauer, a ship surveyor who gave opinion testimony.

Manera's own foreman Hodne, and his partner Alsacker, did not testify, and Manera said that the latter was missing at 3:00 A.M. on October 6th and that he went below in the lower hold alone; this means that his version of what happened is unsupported by other testimony. The two men whom he relieved at 3:00 A.M. and with whom he conversed when they reached the 'tween deck level, could have been in a position to observe what happened when he fell, but their testimony is also missing.

All measurements herein stated are taken from the unimpeached testimony of Second Officer LeCato.

The two salient aspects of the case are, first, whether libellant's fall actually occurred in the manner which he described and which he is assumed to have believed; and second, whether the failure to use the forward ladder for the descent from the 'tween deck level has been adequately explained since that was obviously the safer method of approach to the lower level by reason of the presence of the handholds which the upper section afforded to those using the lower section in going either up or down.

The first question will be the better comprehended by an examination of U. S. Exhibits 2, 3 and 9 which are photographs of the top of the port side ladder, showing also the angle irons and their proximity to the top rung.

These and other photographs in evidence show dunnage, platforms, ship's gear and fittings which were not present in the 'tween deck space nor in the lower hold when the accident happened. Later when the photographs were taken The Murphy was about to be decommissioned and laid up, and the various articles so appearing were stowed in place as shown. As to the ladders, angle irons and other non-transient elements, the photographic exhibits accurately portray physical conditions involved in this litigation.

The ladder was 12 feet long, 15 inches wide, the rungs were 12 inches apart; it was offset 8 inches from the face of the hatch coaming, which means that as to the top and next rung there was that distance into which a foot could enter, thus affording much more than a "toehold." The vertical distance from the bottom of the 'tween deck to the surface of the lower hold was 13 feet.

The distance between the top of the 'tween deck coaming and the top rung of the ladder was 6 inches; the angle irons were of $3/8''$ thickness, and the 6-inch sides ran athwartship, the 4-inch sides fore and aft and their greatest distance from the face of the coaming was 10 inches.

Manera first went below as has been said, at 3:00 P.M. on October 5th. It was then daylight and he descended from the main deck via the forward ladder and when he reached the bottom of its upper section he said he proceeded to the 'tween deck. "I couldn't get down to the lower hold. The simple reason was there was a strongback running athwartships, and there was not sufficient space between the strongback and the ladder to proceed to the lower hold. Therefore * * *."

Since it was later shown that the hatch boards at the foot of this section of the forward ladder were in place, obviously it was not the strongback supporting them that impeded his progress, but the boards themselves. That would be a small matter in the testimony of a person unfamiliar with the difference, but that cannot be said of this libellant. As a matter of fact it proved quite misleading to the Court until later stages in the trial. At best the lapse can be accounted for as being an unimportant detail in the mind of the witness.

Why those hatch boards were in place at all will be later the subject of discussion.

He made his way below safely from the 'tween deck at 3:00 P.M. using the port ladder, as has been stated. This he repeated at 6:00 o'clock (he says he was below only 1½ hours from 3:00 o'clock), and returned at 9:00 o'clock to stay until midnight. During each of these tricks he mounted the ladder to the 'tween deck on several occasions (he said eight or nine) to smoke and otherwise while away the time, as watching the hoses in the lower hold did not call for constant presence in that place. Thus, prior to 3:00 A.M. on October 6th Manera had used this ladder not less than a dozen times, down and up, without incident.

In descending he employed two methods of approach to the top of the ladder: one involved seating himself on a strongback close to but aft of the ladder, and putting first one and then the other foot on the rungs after grabbing the top one. The other method involved backing toward the ladder top from the adjacent side of the 'tween deck while on all fours; this meant so moving through or over the angle irons, gaining a footing ("toehold") first with one foot on the top rung and then with the other presumably on the next lower rung, and thus making the descent. Truly this was an awkward but not impossible method as he himself had demonstrated at least once.

That was how he attempted to descend as he says, at the time he fell. He thus testified: "I got down on my knees and my hands on the deck and reached out with my right foot to get a toehold on that ladder. As I was so doing, I moved my left leg back and I hit the angle iron and over I went. * * *

My hands were on the deck, and I was working my way back." To repeat, this was the method he had used at 3:00 P.M. on the afternoon of the 5th.

The difficulty of accepting this explanation is obvious: In the position described it will be seen that he was backing up the slope of the 'tween deck (see Exhibit 9) on his hands and knees, which means that his body was supported by the deck; then when reaching back with his right foot, his left knee became the sustaining lower member; he then moved his left leg back, which could only mean that he straightened it out while his hands were still on the 'tween deck and he could not fall backward ("over I went") being in that position, since his center of gravity was outboard of the hold more than the distance from the coaming to the angle irons.

It is essential to his cause to establish that the fall was the result of the alleged unseaworthy condition of the ladder, and its consequent deficiency as an element of a reasonably safe place to work, in that the angle irons were not adequate as handholds for one using the ladder. As to that his testimony is at least ambiguous.

He did not consider the angle irons safe because "You cannot grip them as you would the rung of a ladder" (p. 80), but he did that very thing in coming *up* the ladder (p. 81) when he had no trouble in gripping them, and on page 91, describing his backing method, he said:

"You would have to some time or other use the angle irons on the approach down until you could reach the top rung with your hand, bring it back and over and down, and you would balance yourself with one hand on the angle iron until you got a hand grip with either hand on the top rung of the ladder.

"Q. And did you so use the angle irons on each of the occasions when you used this approach which I have described as backing on to the ladder? A. Yes sir.

"Q. Isn't that right? A. Yes."

In view of the foregoing, which means that Manera knew the purpose of and how to use the angle irons, his account of the manner of his fall must be weighed with the understanding that the striking of his left leg against these irons, the outer aspect of which was 10 inches from the edge of the hold, his body being in the position indicated, occurred before he was near enough to the hold to fall.

Doubtless he hit upon the explanation as convincing to himself, while in truth he had no clear mental picture of what immediately preceded his fall. His feet must have been on the ladder when the fall occurred, for otherwise he would not have landed on them; this means that striking the angle irons with his left leg did not so result that "over I went."

It should be said that he did not attribute the episode to any failure of illumination. There was a cluster of electric lights lying on the 'tween deck, which threw horizontal rays toward the opening, and a large bulb hung in the lower hold. There is no contention that the illumination was inadequate, or different from that which functioned during his earlier uses of the ladder during his previous trick.

For failure of persuasion that his fall occurred as he described it, the demonstration of unseaworthiness and of an unsafe place to work because of the alleged inadequacy of the angle irons to serve the uses of those who had to descend or ascend this ladder, is found to be deficient in probative force. Since the condition had existed for about a year, with no testimony of prior difficulty in using the ladder, the libellant's contention is rendered the more tenuous.

There remains to consider the failure on the part of the Salvage Process employees to make use of the forward ladder as to its lower section, for entrance to and exit from the lower No. 5 hold.

It is undisputed that such use would have been feasible, and entirely free

from any hazard due to the absence of an upper section.

Indeed it was the method employed following the accident to Manera, and merely involved the removal of one or two hatch boards at the foot of the upper section. They were four feet five inches long by two feet six inches in width, namely, the nearest strongback to the forward ladder was over four feet aft of it (see Exhibit 1).

This physical condition is so inconsistent with Manera's early testimony as to create skepticism concerning his entire narrative. Thus at page 30:

"Q. * * * Now, you are backing down the (forward) ladder (to the 'tween), aren't you? A. Yes, your Honor.

"Q. Now you *see* a strongback, do you (emphasis added)? A. I believe so, yes, sir.

"Q. Where do you see it? A. Down, adjacent to the ladder, running athwartships.

"Q. At what level? A. At the 'tween deck level. * * * It ran from port to starboard.

"Q. (Mr. Hanan) And whereabouts was the rung across the hold, 'tween deck, or was it in the *opening* (emphasis supplied) there at the 'tween deck. That is what we want to know? A. It was in the *opening* (emphasis supplied) of the 'tween deck.

"Q. When you observed this strongback, how far would you say it was aft or away from the ladder, as it passed by the ladder? * * * A. Approximately six inches, eight inches."

Since we know that the strongback was not less than four feet aft of the foot of the ladder, and that the adjacent hatch boards were in place, there was no *opening* there through which he could see the strongback.

Thus the variance between Manera's testimony and that of Olsen and Bragger about to be referred to exposes another element of weakness in libellant's cause.

But for the quoted reference in Manera's testimony to an *opening* at the foot of the upper section of the forward ladder, it could be argued that he was speaking of the narrow foothold referred to by DeCato (p. 217) but there was no opening in that (see Exhibits 1 and 5) and thus reconciliation fails.

The explanation if such it was, for not resorting to the obviously to be preferred expedient of using the lower section of the forward ladder, consists only in the testimony of Olsen, who was the foreman of another gang, and Bragger who was an oil tank cleaner in the latter; that gang preceded Manera's, of which Hodne was foreman.

Olsen went down in the afternoon of the 5th to this lower hold, using the port ladder, and found two Bethlehem men there cutting the vent pipes. It is possible to infer that these men removed the hatch beams at the port ladder, rather than those at the foot of the forward ladder, but there is no testimony on the subject, and the inference may be questioned.

When the ship arrived at the Yard, tarpaulins had been removed from the hatches, and the latter made ready for removal of the boards as might be needed. Therefore whether the Salvage Process men who carried the hoses below, or the Bethlehem men who cut the vent pipes were first to go below, is at best a matter of conjecture.

Olsen was down in lower No. 5 "quite a few times" and explained how the port ladder was used with a grabbing of the angle irons.

He did not believe that the forward ladder had a lower section. He thought, but was not sure, that the ladder was cut off at the 'tween deck. Later, being shown Exhibit 4 (photo), which reveals the lower section of the forward ladder, he said:

"I couldn't recall that, but it must have been something in the way or we would have gone down that way, I am pretty sure. * * * I could say I see the ladder, but I don't re-

member looking for a ladder, but it seems to me if there was a way to get down there we would have gone down that way."

Again, being asked about directing the Salvage employees to use the port rather than the forward ladder, he said:

"I can't just recall whether I did or not, I don't believe so."

Later he said that if hatch boards and nothing else had been at the 'tween deck foot of the forward ladder, he would have removed them, so as to use that ladder.

This observation is useful as indicating his understanding of his job, although the testimony as a whole makes it clear that there was nothing at the foot of the forward ladder to impede the removal of one or two hatch boards.

Bragger was one of those who took the hoses down for the use which has been stated. When he arrived below, the Bethlehem men were cutting the pipes.

He used the forward ladder down to the 'tween deck, and at that level hatch covers were in place. He removed some on the starboard side to run one hose down. He said that quite a few hatches were open—meaning boards—which he replaced to prevent men from falling.

He used the port ladder to go below. He described the angle irons, and said, "It was very dangerous because if your hand slips on those angle irons—." He used this ladder at least eight times.

He did not take any hatch boards out of the forward section; "If there was any opening there, I covered them up when I came down there for safety."

His testimony as to the lighting was at variance with the others, namely, that it was bright below, but there was no light on the 'tween deck.

Recurring to the hatch boards at the foot of the forward ladder, he said (p. 158):

"Q. But you didn't take the hatch boards off to make access onto that ladder? A. Yes, sir, that is right, I did not.

"Q. You remember this all very clearly six years after this took place? A. Fifty years from now I will remember because it was the lousiest ladder that was on any ship."

\* \* \* \* \* \*

"Q. And you continued to use that lousiest ladder? A. Yes, all the way, until something happened and then they opened the other.

\* \* \*

"Q. And you all continued to use this port side ladder when you could have used the forward end ladder? A. That is a habit you form, you work and you form a habit."

If these witnesses were indeed speaking from memory and not a reconstructed emotion, they make it clear that the forward ladder could and should have been used, but that for some undisclosed reason the exertion of lifting at most two hatch boards was deliberately avoided, so that an existing opening, similarly created, could be employed even though it entailed the use of a ladder which Bragger held in the low esteem which his characterization indicated.

For present purposes it is thought that the term "lousiest" and "unseaworthy" are not synonymous.

■ Since the forward ladder was obviously available and was free from any hazard whatever, it becomes apparent that the ship was not unseaworthy, nor was access to lower No. 5 hold attended with risk except to the extent that the gangs who worked there chose to make it so. Such is the present finding.

The libellant argues that the duty of the ship and of Bethlehem was not discharged by providing structural equipment reasonably fit for the use for which it was intended, Berti v. Compagnie etc., 2 Cir., 213 F.2d 397 at page 400, and hence a reasonably safe place in which the Salvage Process employees could

work, but that the law exacts of both a kind of supervisory responsibility—a sort of nursing care—that would ordain that those employees should have been forbidden to disregard the plain provisions which had been made for their welfare, by intervening and insisting that only the forward ladder be used even though the use of the port ladder had been observed by LeCato.

The cases cited for libellant have been examined, and none seems to go so far. All of them involve an appliance initially infirm, or one that became so through use. No such condition is revealed in this record.

Olsen's assumption with regard to there being no lower section of the forward ladder was patently mistaken. What Manera's foreman assumed or decided on the subject is not known.

As an experienced shipfitter it is reasonable to suppose that if Manera had regarded the port ladder as an unsafe fitting he would have so reported during his hours off from 6:00 to 9:00, which he spent on The Patco. He testified to no such protest to his foreman Hodne, or to anyone else, which supports the inference that he did not then regard the port ladder as constituting an unseaworthy element of the ship's structure.

Since the forward ladder provided an entirely safe way to reach the lower hold, and its presence was obvious in lower hold No. 5 (see Exhibits 4 and 6), it results that the Salvage Process employees elected to use the port ladder which was less safe—though not I think unseaworthy—for reasons which have not been made clear. The choice was theirs, not that of the ship (its officers), or the Bethlehem Company engaged in making the overall repairs.

The decision in Hardie v. New York etc. Co., 2 Cir., 9 F.2d 545, is thought to embody the rule which is applicable to the facts here involved. Assuming that it is still the law, it visits upon grown men a certain responsibility in selecting a method or means to accomplish a purpose when the choice between a safe and a questionable one is more important to them than to anyone else.

The opinion testimony of the witness Finkenauer has not been overlooked, but for reasons therein revealed it has not been found acceptable.

For completeness it may be added that the presence of the escape ladder, accessible from the bottom of No. 5 hold, leading to the main deck, has not been overlooked. It is convincing to indicate the precautions taken in the design of the ship for the benefit of those compelled to labor in a remote place, but its presence and availability is not shown to have been known to libellant, nor could he have been expected to be aware of its accessibility to the extent that applies to the forward ladder.

The libellant's proof is not sufficient to sustain his cause and it is so found. Thus the subordinate questions sought to be introduced by the impleading petition and interestingly discussed in the briefs of the respective respondents, do not require decision.

The libel will be dismissed with costs, and so also the impleading petition.

Settle decree.