Margaret GRENAWALT, as Administratrix of the goods, chattels and credits of Roy C. Grenawalt, deceased, Plaintiff,

v.

SOUTH AFRICAN MARINE CORPORATION, Limited, Defendant.

United States District Court
S. D. New York.
April 15, 1955.

Milton L. Neimark, New York City, for plaintiff, Jacob Rassner, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant, James B. Magnor, Joseph M. Cunningham, New York City, of counsel.

WEINFELD, District Judge.

This is a wrongful death action predicated upon the defendant's alleged negligence in failing to provide the decedent, Roy C. Grenawalt, with a reasonably safe place in which to work aboard the de-

fendant's vessel, the SS Morgenster.[1]

The decedent met his death on April 15, 1952 aboard the Morgenster when he fell into the upper tween deck of the No. 3 hatch. Grenawalt was an employee of an independent stevedoring firm engaged in loading the vessel while she was moored to the dock at Pier 51, North River, New York City. He was the foreman in charge of all the stevedore gangs engaged in loading her 5 holds. The fore and aft length of the No. 3 hatch was 36 feet and its width was 22 feet. The hatch coaming was approximately 2½ feet high.

Several days before reaching the port of New York and while at Charleston, South Carolina, a cargo of pine lumber and timber had been stowed on the main deck on the port and starboard sides of the No. 3 hatch. The lumber cargo had been piled on the deck to a height of about 7 feet, or about 4½ feet above the hatch coaming. The distance between the inboard edge of the deck cargo and the hatch coaming was approximately 18 inches. The distance between the outboard edge of the cargo and the outboard rails was about the same.

The deck cargo was secured by heavy chains and turn buckles which ran from padeyes on the deck, over the top of the cargo, to padeyes on the other side, and except for the chains which were spaced 6 feet apart and ran athwartship, the deck cargo was flat and level.

In order to load cargo into the tween deck at the No. 3 hatch the longshoremen at the start of the day's work had removed four of the six steel main deck hatch covers (or pontoons) and had placed them atop the deck cargo on the starboard side of the vessel. The pontoons which were each 22 feet by 5 feet, were stowed two high and two abreast. The inboard edge of the nearest pontoon was set back about two feet from the inboard edge of the deck cargo.

The vessel was tied to the dock bow in, port side alongside. Loading operations into the hatch continued throughout the day by means of the forward booms. They had been rigged so that the port or inshore boom was swung over the ship's side; the off-shore or starboard boom was spotted over the square of the No. 3 open hatch. The booms were shackled together (married) and the Burton boom lifted the cargo from the pier and the up and down boom lowered it into the hatch.

Grenawalt met his death at the end of the day's work when the pontoon covers were about to be raised for replacement over the hatch. To accomplish this it was necessary to swing the up and down boom over the open hatch to a point where the toe would be directly over the pontoons atop the starboard deck cargo. To complete the operation one had to stand on the deck cargo and fasten the cargo hook of the married falls into a bridle attached to the pontoon. Grenawalt was in charge. He stood about midpoint on the starboard side of the No. 3 hatch with one foot on the pontoon nearest the open hatch and the other on the deck cargo. He called to Nonne, a gangwayman who was on the port side deck cargo, to swing the cargo hook over to him, Grenawalt. Nonne hauled on the inshore wire runner and pulled the hook back towards himself as far as he could and then swung the block across the width of the hatch, but Grenawalt missed it and the hook swung back to its position over the center of the hatch. Grenawalt ordered the swing repeated, whereupon Nonne suggested that he "walk" the hook around to where Grenawalt was standing. But the latter vetoed the proposal and renewed his order. In the meantime Grenawalt had changed his position and stood with both feet on the deck cargo closer to the open hatch. He was then 1½ feet from the inboard edge of the cargo and about (3) feet from the coaming.

1. The action is brought under New York's Wrongful Death Statute, McKinney's Consol.Laws of N.Y. c. 13, Decedent Estate Law, § 130 et seq. The complaint alleges diversity jurisdiction.

Nonne then swung the hook the second time, giving it an extra shove, and Grenawalt caught it, just as, in effect, it concluded the arc of a pendulum. But the weight of the hook or the momentum of the backward swing pulled him off his footing and forward over the open hatchway where, midway, he lost his grip and was plunged below, his head striking the hatch board of the upper tween deck. He was rendered unconscious and died within an hour without regaining consciousness.[2]

There is little controversy upon the essential facts as testified to by Nonne and two ship's officers who were also eye witnesses. The principal disagreement is as to whether the surface of the deck cargo on which Grenawalt stood was free of oil and grease or other slippery substance. In view of the statements made to officers of the New York City Police Department in the course of an official inquiry, and other statements given within a day following the accident, wherein Nonne made no mention of any such substance, I am of the view that his trial testimony to the contrary was fabricated. Upon the entire record, I find there was no grease, oil, or other slippery substance on the deck cargo although it was slightly damp from a drizzling rain. This eliminates one ground of claimed negligence.

However, there remains the further charge that the defendant violated its non-delegable duty to provide a reasonably safe place to work in that the stowage of the deck cargo 4½ feet above the coaming and in close proximity to the open hatch created a condition of imminent danger to men working in the area and deprived them of the protection afforded by the hatch coaming surrounding the open hatch.

The defendant, in addition to a denial of the charge, also asserts that the accident was due solely to decedent's negligence.

That the decedent was guilty of contributory negligence admits of no dispute.[3] To have stood on the deck cargo so close by the open areaway in an effort to catch the swinging hook and ball weighing 40 or more pounds obviously was a situation fraught with danger. The decedent had several choices which were safe; either to have had the hook "walked" over to him, or to have caused the boom to be placed over the pontoon for a direct spot so that the cargo hook could be attached to the bridle. Neither choice was adopted by him. Instead, he ordered the cargo hook swung across the open hatch. After the first swing had failed, it was or should have been apparent to the decedent that the backward pull of the swinging hook would tend to drag anyone attempting to hold on to it off the platform. Disregarding the peril, he stepped closer to the open hatch and insisted that the swing be repeated, even after Nonne, seeking to avoid the danger, offered "to walk the hook" around to where Grenawalt was standing. Under the circumstances, the decedent "must have been either totally indifferent to any possibility of danger, or have paid no attention whatever to his footing."[4] The defendant has fully sustained its defense.

Further, the plaintiff has failed to meet her burden of proof of defendant's negligence or of proximate cause.[5]

---

2. The claim based upon conscious pain and suffering was withdrawn upon the trial.

3. Under New York State's death statute, McKinney's Consol.Laws, c. 13 Decedent Estate Law, § 131, the burden of proof on the issue of contributory negligence is upon the defendant.

4. Guerrini v. United States, 2 Cir., 167 F. 2d 352, 356.

5. This finding makes it unnecessary to consider the interesting question as to whether under existing New York law in a wrongful death action based on a maritime tort contributory negligence constitutes a bar to recovery or goes to diminution of damages. *Compare* Groonstad v. Robins Dry Dock & Repair Co., 236 N.Y. 52, 139 N.E. 777; Maleeney v. Standard Shipbuilding Corp., 237 N.Y. 250, 142 N.E. 602; Puleo v. H. A. Moss & Co., 2 Cir., 159 F.2d 842; Spinelli v. Seatrade Corporation, 277 App.Div. 992, 99 N.Y.S.2d 945, *with* Riley v. Agwilines,

The testimony warrants a finding that the lumber stowage on the deck was in accord with the proper and approved custom both at Charleston, South Carolina, where it was originally loaded, and at the port of New York.

Plaintiff does not urge, as indeed she cannot, that to load any cargo on the deck of a vessel constitutes negligence. But she does contend "the lumber was piled to a height which rendered its top surface 5 feet above the coaming of the holds, so that a person working on top of this lumber would not have any benefit from the presence of the coaming which was a number of feet below the working surface." The benefit of the coaming would of course be lost whenever any substantial amount of lumber is piled on the deck. Thus the claim of negligence is narrowed to the alleged absence of sufficient space between the lumber and the hatch coaming. However, a passageway, whether 9 inches, as plaintiff claims, or 2½ feet as defendant's witnesses testified, or even a greater distance, would have served no purpose since in any event Grenawalt could not have worked there. Grenawalt still would have had to stand atop the deck cargo. The cargo hook could only have been attached by one standing either on the pontoon or on the deck cargo where in fact Grenawalt was located.

■■ Nor was it negligence to require stevedores to work from atop deck cargo in loading into the open hold.[6] Indeed, the evidence supports a finding that it was a general practice in this port to load and unload a ship which has deck cargo on it alongside an open hold, similar to the way the deck cargo was stowed on defendant's vessel at the time decedent met his death. The danger existed not because of the height of the lumber or the absence of a passageway, but only because Grenawalt, disregarding the available safe methods, ordered the hook swung over to him while on top of the cargo. Had the decedent acquiesced in Nonne's suggestion, his position would have been perfectly secure. "If there be two ways, one safe and the other dangerous, the servant chooses the dangerous way at his peril, if the difference is known to him."[7]

Even assuming arguendo that it was negligent conduct to allow a 9 inch passageway or working area, no causal relationship has been established between such claimed negligence and the occurrence.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Should either party desire further or enumerated Findings of Fact these may be proposed within five days upon two days notice.

Inc., 296 N.Y. 402, 73 N.E.2d 718; Mc-Fall v. Compagnie Maritime Belge, 304 N.Y. 314, 107 N.E.2d 463; W. E. Hedger Transp. Co. v. United Fruit Co., 2 Cir., 198 F.2d 376. And see O'Leary v. United States Lines, 1 Cir., 215 F.2d 708; Byrd v. Napoleon Avenue Ferry Company, D.C. E.D.La., 125 F.Supp. 573.

6. Cf. Miller v. The Sultana, 2 Cir., 176 F.2d 203; Long v. Silver Line, 2 Cir.,

48 F.2d 15; Smith v. United States, D.C. S.D.N.Y., 18 F.2d 110, affirmed, 2 Cir., 18 F.2d 111.

7. Hardie v. New York Harbor Dry Dock Corporation, 2 Cir., 9 F.2d 545, 546. Cf. Learned Hand, J., concurring in Lynch v. United States, 2 Cir., 163 F.2d 97, 99.