Pasquale PALERMO, Plaintiff-Appellee,

v.

LUCKENBACH STEAMSHIP COMPANY, Inc., Defendant-Appellant.

No. 119, Docket 24245.

United States Court of Appeals Second Circuit.

Argued Jan. 11, 1957.

Decided July 8, 1957.

Philip F. DiCostanzo, Brooklyn, N. Y. (Robert Klonsky, New York City, and Thomas J. Livornese, Flushing, N. Y., of counsel), (and on brief), for plaintiff-appellee.

Burlingham, Hupper & Kennedy, New York City (Eugene Underwood, William M. Kimball, New York City, of counsel), for defendant-appellant.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

The defendant, Luckenbach Steamship Company, appeals from a judgment below entered upon a jury verdict awarding the plaintiff, Pasquale Palermo, $65,000 damages for personal injuries sustained while he was working as a longshoreman on a ship owned and operated by the defendant. The complaint alleged that the injuries were caused by the defendant's negligence in failing to provide the plaintiff with a reasonably safe place to work, and by the unseaworthy condition of the defendant's steamship, the Marine Snapper.

The evidence adduced at the trial tended to establish the following facts: On February 15 and 16, 1955, the plaintiff was employed by Turner & Blanchard,

Inc., a stevedoring concern engaged in the unloading of the Marine Snapper. Palermo was in charge of a hatch gang that was unloading cargo from the aft part of the No. 2 hatch. The ship lay starboard to the 35th Street Pier, Brooklyn, and was discharging cargo on that side.

At 6:00 p.m. on February 16, the longshoremen, including the plaintiff, left the ship for "lunch." At 7:00 p.m. they again boarded the vessel, Palermo delaying a minute or two on the pier to make sure that all his men had returned to work.

The Marine Snapper, a C-4 cargo vessel, has a raised forecastle deck on which are located the forward deck house and Nos. 1 and 2 hatches. The gangway was aft at the lower level of the well deck. After boarding on the starboard side, Palermo crossed over to the port side and proceeded forward. He climbed the ladder to the forecastle deck, and then entered the port passageway, which ran between the deck house and the port rail. At the end of the passageway, flush with the forward end of the deck house, was a three-inch sill on the deck. At approximately 7:05 p.m. the plaintiff tripped on the sill and fell forward to the deck, thereupon sustaining the severe and disabling injuries to his elbow and right arm for which he here sought recovery. Palermo testified that as he approached the sill, he slipped on some oil or grease that had accumulated on the deck after a nearby winch drum had been greased by members of the ship's crew. He also testified that the two nearest bulkhead lights were off, and that the port passageway was very dark. This latter statement was corroborated by the testimony of another hatch boss who had preceded Palermo through the passageway.

On cross-examination the plaintiff testified that prior to his accident he knew that there was grease on the deck of the port passageway and that the bulkhead lights which normally illuminated that area were out. Indeed, he had called the latter fact to the attention of one of the crew members when he left the ship at 6:00 p.m., since it was already dark at that hour.

There was further evidence that the plaintiff, after mounting the ladder to the forecastle deck, could have recrossed the ship to the starboard side by means of a three-foot thwartships passageway directly abaft the deck house, and could then have proceeded forward to his place of work through the starboard passageway, which was sufficiently lighted. Since the plaintiff's hatch gang was working on the starboard side of the ship, it appears that this route would have been no longer than the one chosen by Palermo.

There was conflicting testimony, however, as to the difficulties or dangers posed by this route. One witness for the plaintiff testified that both holds No. 2, which was forward, and No. 3, which was on the well deck just aft of the forecastle, went into operation promptly at 7:00 p.m., and that anyone thereafter walking along the starboard side might have been hit by drafts being discharged from those hatches, or might have encountered winch grease, coils, or other equipment in operation. Also, if No. 3 hold was being worked, two winchmen would be located in the thwartships passageway abaft the deck house, thus tending to impede travel by that route. However, the ship's log and the supercargo's memorandum book indicated that the No. 3 hold was not worked between 6:00 p.m. and 9:00 p.m. on February 16.

Both the port and starboard passageways, as well as the passageway directly abaft the deck house, were covered, and thus protected from unloading operations. Running across the forward end of the deck house was a narrow platform raised about two feet off the forecastle. This platform was protected from above by the edge of the bridge.

■ On appeal the defendant argues that the trial court erred (1) in refusing to charge the jury that the plaintiff was not entitled to any recovery if he voluntarily chose to use a passageway known by him to be unsafe and if there was another available passageway known by

him to be safe; and (2) in denying the defendant's motion after trial to set aside the verdict for excessiveness.

We believe that the court below, in refusing to give the requested charge,[1] committed reversible error, and we are therefore remanding this case for a new trial. In view of this disposition, it is unnecessary to discuss the appellant's second contention.

Judge Learned Hand, writing for this court, said in Hardie v. New York Harbor Dry Dock Corp., 2 Cir., 1925, 9 F.2d 545, 546, a suit for negligence by the administratrix of the estate of a machinist's helper against the intestate's employer, a ship repairer: "If there be two ways, one safe and the other dangerous, the servant chooses the dangerous way at his peril, if the difference is known to him." A few years later, in a negligence action by a harbor worker against the shipowner, this court, relying on Hardie, held that "There is no duty to keep a dark way safe if a light way is provided." Long v. Silver Line, Ltd., 2 Cir., 1951, 48 F.2d 15, 16.

In the ensuing years this court, even when the defendant appeared to have been negligent, applied the doctrine of assumption of risk on several occasions to deny recovery to seamen who sued the shipowner for injuries sustained while on board but at a time when the plaintiffs were not technically "on duty." See, e. g., Holm v. Cities Service Transp. Co., 2 Cir., 1932, 60 F.2d 721; Johnson v. United States, 2 Cir., 1935, 74 F.2d 703. Subsequently, in Socony-Vacuum Oil Co. v. Smith, 1939, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265, the Supreme Court held that assumption of risk was not a defense in a suit brought by a seaman under the Jones Act, 46 U.S.C.A. § 688, to recover for injuries resulting from his use, while "on duty," of a defective appliance of the ship when the plaintiff chose to use the unsafe appliance instead of a safe method which was known to him. The Court declared that under such circumstances conduct formerly labeled "assumption of risk" was to be treated as only contributory negligence, and thus could be considered only in mitigation of damages. The role of the assumption of risk doctrine in cases where the seaman's injury occurred while he was "off duty" was expressly left open.

In Wong Bar v. Suburban Petroleum Transport, Inc., 2 Cir., 1941, 119 F.2d 745, this court reaffirmed its adherence to the rule set out in the Holm case, and stated that assumption of risk was a defense, under the Jones Act, when a seaman's injury resulted from the knowing choice of a defective appliance when a safer one was available, if the injury occurred when the plaintiff was not on duty. The rationale underlying this distinction apparently sprung from an appreciation of the substantially increased, and somewhat unique, pressures under which a seaman works while he is on duty. The application of this rationale has been rendered extremely difficult, if not impossible, however, by the recent rapid development of the law in the area of maritime torts.[2] Be that as it may, despite the attempt of the plaintiff to commingle the reasoning of the Hardie case with that of the Holm decision, we emphasize that in deciding this case we are *not* invoking assumption of risk principles, nor are we applying a rule

---

1. The charge requested by defendant that the Court did not submit to the jury and the charge on this point that the Court gave are each quoted in full in the body of the dissenting opinion.

2. For example, the availability of the doctrine of unseaworthiness, traditionally limited to seamen, was extended to stevedores in Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L. Ed. 1099, and then to other harbor workers in Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. In addition, the doctrine itself was transformed from a duty to use *due diligence* to provide a seaworthy ship to an *absolute* duty to so provide. See, e. g., Seas Shipping Co. v. Sieracki, supra, and Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. See generally Gilmore & Black, The Law of Admiralty, §§ 6–38 to 6–44, 6–55 (1957).

whose applicability depends upon the distinction between "on duty" and "off duty."

■ It seems clear that the Hardie rule, albeit qualified, has retained its vitality in cases where the action sounds solely in negligence. In Lynch v. United States, 2 Cir., 1947, 163 F.2d 97, decided prior to the Hawn extension of the unseaworthiness doctrine to harbor workers other than stevedores, Judge Learned Hand, in a concurring opinion, 163 F.2d at 99, explained his earlier decision:

> "In Hardie v. New York Harbor Dry Dock, we held that, if there was a safe way provided for an employee of a contractor, and he chose an unsafe way, the owner was absolved. That was right, as applied to the facts of that case, but I doubt that it would be safe to say that the mere existence of one safe way was always a complete exoneration. That depends, I think, upon the likelihood that the employees would not take the unsafe way; if there was a reasonable probability that they might do so, I think the shipowner's duty extends to reasonable care to see what dangers lurk in the other way, and to advise the employees of them."

Of course, if the plaintiff was already aware of the danger lurking in his chosen course prior to his injury, the shipowner owed him no duty of warning. Long v. Silver Line, Ltd., 2 Cir., 1931, 48 F.2d 15, 16.

■ The Hardie case was recently quoted and relied upon by Judge Weinfeld in a wrongful death action based upon the defendant shipowner's alleged negligence in failing to provide the decedent stevedore with a reasonably safe place to work. Grenawalt v. South African Marine Corp., D.C.S.D.N.Y. 1955, 130 F.Supp. 432, affirmed, 2 Cir., 1957, 243 F.2d 575. It is our belief, moreover, that the Hardie rule is applicable even in actions where the plaintiff sues for a breach of the shipowner's implied duty to maintain his ship in a seaworthy condition. That is, we do not think a ship, when it is tied to a pier, is unseaworthy if a safe route is provided to the plaintiff's place of work, and the plaintiff knowingly elects to forego that route for one that he has reason to believe is dangerous. Support for our position can be found in a recent District Court decision. Manera v. United States, D.C.E.D.N.Y.1954, 124 F.Supp. 226. Cf. Bohannon v. United States, D.C. S.D.N.Y.1950, 92 F.Supp. 700 (where a similar result was supported by reliance on the "assumption of risk" cases mentioned above).

However, on the basis of this record we cannot direct the entry of judgment for the defendant. The evidence below is too conflicting on several crucial questions of fact, the resolution of which must be left to the jury. Thus, although it seems clear that Palermo was aware of the dangers inherent in the unlighted port passageway, it is less clear that the thwartships and starboard passageways presented a safe and easily traversible route to the plaintiff's place of work at the No. 2 hatch. For example, the defendant contends that there could have been no winchmen in the thwartships passageway abaft the deck house at 7:05 p.m. because the Nos. 3 and 4 holds were not being worked at that time. The plaintiff, on the other hand, claims that two winchmen were located in the passageway just prior to the accident, and that their presence would have impeded travel by that route. The plaintiff also argues that he would have been exposed to the perils incident to discharging operations on the starboard side if he had proceeded forward to his place of work on that side of the ship. This assertion was met below by the defendant with evidence that only holds No. 1 and No. 2 were in operation at the time of plaintiff's injury. The defendant also points out that the plaintiff was the boss of the hatch gang working at the aft end of the No. 2 hatch, and "if, upon reaching the forward end of the starboard passage he had found a draft of

cargo swinging in such a way as to endanger his going further forward, he could have either waited or, as hatch boss, directed the suspension of work until he reached the place he desired to reach." With less force, the defendant also argues that the plaintiff could have used the narow, but protected, platform along the forward end of the deck house in any emergency.

Hence at a new trial it will be necessary, under instructions from the court in accord with the principles outlined above, for the jury to determine, *inter alia,* the relative risks presented by the two alternative routes to the plaintiff's place of work and the plaintiff's knowledge of a substantial difference in those risks, if such existed, at the time he elected to go by the starboard passageway.

Reversed and remanded.

CLARK, Chief Judge (dissenting).

I have had occasion recently to express my concern at a growing tendency in this court to upset awards in jury cases. See Kermarec v. Compagnie Generale Transatlantique, 2 Cir., 245 F.2d 175. Today's decision continues that trend, adding some new curiosities. Thus my brothers find reversible error in the trial judge's failure to give a particular requested charge, but they never quote the request or the charge actually given. They next repudiate any suggestion that they would use the anachronism of "assumption of risk," whose shifting meanings we recently discussed in Sanderson v. Berkshire-Hathaway, Inc., 2 Cir., 245 F.2d 931. But their result in substance rests on that analysis; they support their decision by cases turning on that doctrine; and the error which they find is a failure to instruct the jury on that doctrine. Lastly, their general discussion seemingly points to a directed verdict for the defendant until they ultimately shy from so drastic a ruling and rest the forced retrial upon the judge's rejection of what is, to say the least, a highly dubious formulation of law. I do not find in all this a sound reason for disturbing the jury's verdict and the court's judgment.

Turning to the crucial issue, there was a factual dispute concerning the relative safety of the route which the plaintiff took and a hypothetical route which the defendant claimed he might have taken. The plaintiff contended his route was safer and shorter; the defendant denied these facts. This comparison of routes affects four possible issues in the case: (1) the defendant's negligence; (2) unseaworthiness; (3) plaintiff's contributory negligence; (4) plaintiff's assumption of risk. The trial judge, after a judicious, if lengthy, exposition of the pleadings and the evidence, went on to charge the jury as follows:

"Well, these are the issues of fact: It is for you to say whether there was grease in the passageway at the time that the plaintiff fell; whether he fell in the manner in which he did say he fell; whether the illumination was on or whether there was no illumination of that passageway.

"It is the duty of the vessel, among other duties, in respect to this passageway at least, it is the burden imposed by law on the vessel, to make it seaworthy.

"Now, what does seaworthy mean in this case? Seaworthy applied to this case means that that passageway must be reasonably safe for the purpose for which it was intended. Consequently, you have to determine whether it was so, or whether there were other acts of negligence which precipitated this accident.

"Now, in determining liability, there can be no liability imposed on the defendant unless the plaintiff has established to your satisfaction the essential allegations of his complaint. If you find that the plaintiff has done that, then you approach another subdivision of the matter of liability, and that is whether the plaintiff was guilty of contributory negligence.

"The defendant says he was. Of course, the burden is on the plaintiff to show that he was free from contributory negligence. As I re-

call, the plaintiff said that he had gone over this passageway before and that he had noted the grease spots. Knowing that, should he have been more careful on his return than he was?

"The defendant urges that if the plaintiff knew there were grease spots on the port side in the passageway leading to Hatch 3, why, he should have used the starboard; to which the plaintiff responds that that would not have been a wise move because the unloading was in progress to the shore, the winches were in operation and that the unobstructed passageway was on the port side.

"If you should find that the plaintiff contributed to the happening of the accident by his own negligence, that is, after having first found the defendant is liable, if you should so determine, then, from any award you might otherwise give the plaintiff, you have to deduct whatever percentage of negligence the plaintiff is guilty."

It is clear from his charge that the judge made the following assumptions of law: (1) that there was no need to charge as to the defendant's negligence, since unseaworthiness provided a route to recovery, with fewer elements to prove; (2) that the failure to light the port passageway and to keep it clean from grease was ground for recovery if it rendered it less than reasonably safe for its intended purpose; (3) that the plaintiff's alleged choice of a more dangerous route went only to reduce the amount of recovery under the doctrine of contributory negligence; (4) that assumption of risk was not apposite on these facts. I agree with all four conclusions. My brothers do not discuss the charge explicitly, but their discussion shows that they quarrel with the second conclusion and accept the others.

My brothers reverse because, as they say, the trial judge refused to charge that the plaintiff "was not entitled to any recovery if he voluntarily chose to use a passageway known by him to be unsafe and if there was another available passageway known by him to be safe." The charge actually requested was this:

"12. Even if you should find that Mr. Palermo was hurt because the passageway on the port side of the deck housing was unsafe and that the unsafe condition caused the ship to be unseaworthy or resulted from the negligence of the Steamship Company, I charge you as a matter of law that Mr. Palermo is not entitled to any money from the defendant if there was a safe passageway on the starboard side of the deck housing which he could have used and if Mr. Palermo knew or ought to have known that fact and nevertheless voluntarily chose to use the port passageway."

This proposed instruction stated the law incorrectly and there was no error in rejecting it. First, the instruction was an attempt to introduce assumption of risk into the case. It makes no sense any other way. For if its theory was contributory negligence, it wrongly allowed the jury to defeat all recovery, instead of merely reducing it. If its theory was to provide a particular application of negligence or seaworthiness, it was confusing, for it started from the premise that the jury had already resolved these issues in favor of the plaintiff. It thus forces a compulsion of choice on the plaintiff which neither the facts nor the law justifies.

The charge is further quite objectionable in its assumption that the defendant could in no event owe any higher duty to the plaintiff than to warn him of the danger in the port passageway. The majority cite the concurring opinion in Lynch v. United States, 2 Cir., 163 F.2d 97, 99, for the proposition that it may be negligent not to warn of the dangerous passage; but neither that case nor any other case cited to us holds that the duty of reasonable care is always satisfied by a mere warning. Often, where the continued presence of the peril

serves no important useful purpose to the defendant and the cost of removing the peril is small, a reasonable man will remove the danger, and not just warn of it. This is a perfect example of such a situation: How simple it would have been to replace the burned-out light bulbs, wipe up the grease, and prevent this accident!

Until now I have assumed with my brothers that the liability of the shipowner for unseaworthiness is identical with his duty to use reasonable care to keep the vessel reasonably safe for invitees, but of course this is not so. Seaworthiness is a higher standard, as the court below understood. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099. The defendant would not be liable under notions of negligence for a dangerous patch of grease or burned-out bulbs until it should have discovered and repaired them, but its liability for unseaworthiness arose almost as soon as the defects occurred. Poignant v. United States, 2 Cir., 225 F.2d 595; Grillea v. United States, 2 Cir., 232 F.2d 919; Williams v. Tide Water Associated Oil Co., 9 Cir., 227 F.2d 791, certiorari denied Tidewater Associated Oil Co. v. Williams, 350 U.S. 960, 76 S. Ct. 348, 100 L.Ed. 834. The duty to keep stairs and passageways seaworthy is not satisfied by warning the users of defects and allowing them to find alternative routes. See Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 2 Cir., 234 F. 2d 253, 258.

The only case cited by my brothers in which the presence of a better alternative route defeated recovery for unseaworthiness is the unappealed lower court decision, Manera v. United States, D.C. E.D.N.Y., 124 F.Supp. 226, involving two ladders into a hold, one of which was without an upper section. The plaintiff fell off the short ladder and recovery was denied, *inter alia*, because he should have used the safer ladder. But that case reveals a critical factual distinction: the ladder from which the plaintiff fell, while it was less safe, was nevertheless "seaworthy"; it had been necessary to remove its upper section to make room for cargo in the 'tween deck. It was in its normal condition when plaintiff injured himself by using it improperly. In the instant case the grease and burned-out lights on the port passageway were not deliberate alterations designed to make the vessel perform its function better, but were defects of no use to the ship and of great danger to its crew. See Long v. Silver Line, 2 Cir., 48 F.2d 15.

Thus the decisive issues of fact were left to the jury under a proper and appropriate charge. Its decision for the plaintiff should stand.